**Tanya NUNEZ, Plaintiff**

v.

**BNSF RAILWAY COMPANY, Defendant.**

**Case No. 09–4037.**

United States District Court, C.D. Illinois.

Aug. 9, 2012.

Richard L. Steagall, Ryan Scott McCracken, Nicoara & Steagall, Ralph D. Davis, Janssen Law Center, Peoria, IL, for Plaintiff.

Stephen J. Heine, Robert M. Bennett, Shari Lynn Berry, Heyl Royster Voelker & Allen, Peoria, IL, for Defendant.

## ORDER and OPINION

JOHN A. GORMAN, United States Magistrate Judge.

The parties have consented to have this case heard to judgment by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and the District Judge has referred the case to me. Now before the Court are: the Defendant's motion for summary judgment (# 57) and the Defendant's motion to strike Plaintiff's response (# 69).

Defendant's Motion to Strike that response was carefully considered. One of the considerations was that the motion for summary judgment and its response and reply were filed before the Court's *Daubert* Order was entered. That means that a significant amount of Plaintiff's effort in her Response to the summary judgment motion is based on the testimony of her experts. The Court weighed whether to require Plaintiff to file an amended response that took into account the Court's *Daubert* ruling, but in the interests of efficiency, the Court determined the requisite adjustments could be made without requiring the Plaintiff to replead.

The particular deficiencies in the Response pointed out by Defendant were also considered, and it is true that Plaintiff's citations to that record were, in many instances, less specific than is required by Rule. The Court's familiarity with the case enabled it to overlook these deficiencies. In the interests of efficiency, the motion to strike is DENIED.

## JURISDICTION AND VENUE

Jurisdiction is founded on the diversity of the parties' citizenship, pursuant to 28 U.S.C. § 1332(a)(1) and (c)(1). Plaintiff is the Administrator of the Estate of Cynthia Madden, deceased. Ms. Madden was a citizen of the State of Illinois. Defendant BNSF Railway Company ("BNSF") is a corporation incorporated under the laws of Delaware with its principal place of business in Texas.

The Estate is being or was administered in Rock Island County, Illinois. Defendant conducts business in Henry and Rock Island Counties, Illinois, and the claims involved in this litigation arose in Henry County, Illinois. Venue exists in this District under 28 U.S.C. § 1391(a). Pursuant to Local Rule CDIL 40.1(c), the case is assigned to the Rock Island Division of this District.

## SUMMARY JUDGMENT GENERALLY

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment should be entered if and only if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. See *Jay v. Intermet Wagner Inc.*, 233 F.3d 1014, 1016 (7th Cir.2000); *Cox v. Acme Health Serv.*, 55 F.3d 1304, 1308 (7th Cir.1995).

In ruling on a summary judgment motion, the court may not weigh the evidence

or resolve issues of fact; disputed facts must be left for resolution at trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. *Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 922 (7th Cir.1994). The court has one task and one task only: to decide, based on the evidence of record, whether there is any genuine dispute of material fact that requires a trial.

The court is to examine all admissible facts, viewing the entirety of the record and accepting all facts and drawing all reasonable inferences in favor of the non-movant, *Erdman v. City of Ft. Atkinson,* 84 F.3d 960, 961 (7th Cir.1996); *Vukadinovich v. Bd. of Sch. Trustees,* 978 F.2d 403, 408 (7th Cir.1992), cert. denied, 510 U.S. 844, 114 S.Ct. 133, 126 L.Ed.2d 97 (1993); *Lohorn v. Michal,* 913 F.2d 327, 331 (7th Cir.1990); *DeValk Lincoln Mercury, Inc. v. Ford Motor Co.,* 811 F.2d 326, 329 (7th Cir.1987); *Bartman v. Allis–Chalmers Corp.,* 799 F.2d 311, 312 (7th Cir.1986), cert. denied, 479 U.S. 1092, 107 S.Ct. 1304, 94 L.Ed.2d 160 (1987), and construing any reasonable doubts against the moving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Trotter v. Anderson,* 417 F.2d 1191 (7th Cir.1969); *Haefling v. United Parcel Serv., Inc.,* 169 F.3d 494, 497 (7th Cir.1999).

The existence of "some alleged factual dispute between the parties," or "some metaphysical doubt," however, does not create a genuine issue of fact. *Piscione v. Ernst & Young, L.L.P.,* 171 F.3d 527, 532 (7th Cir.1999). In other words, not just any dispute will suffice to defeat summary judgment. In order to defeat summary judgment, the non-movant must produce "significantly probative" evidence, *Celotex,*

477 U.S. at 327, 106 S.Ct. 2548, showing that there is a *genuine* dispute about a *material* fact. A material fact is one that is essential to a party's case. "Inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *McDonald v. Village of Winnetka,* 371 F.3d 992, 1001 (7th Cir. 2004). A scintilla of evidence in support of the non-moving party's position is not sufficient to oppose successfully a summary judgment motion; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505. The proper inquiry is whether a rational trier of fact could reasonably find for the party opposing the motion with respect to the particular issue. See, e.g., *Jordan v. Summers,* 205 F.3d 337, 342 (7th Cir.2000).

The parties must identify the evidence (i.e. those portions of the pleadings, depositions, answers to interrogatories, admissions, affidavits, and documents) that will facilitate the court's assessment. *Waldridge,* 24 F.3d at 922. See, *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). See also, Local Rule CDIL 7.1(D).

Evidence used to support or oppose summary judgment must be admissible at trial. Fed.R.Civ.P. 56(c)(2). In a *Daubert* Order (# 79, as supplemented by an Order entered this date denying a motion to reconsider), this Court granted BNSF's motion to bar Plaintiff's two experts. In that Order, the Court found their opinions to be wholly lacking in factual, evidentiary, and/or legal support; not based on objective or scientific evidence; unreasonable; and/or unhelpful; Because the testimony and Report of Plaintiff's experts have been barred, evidence based on their testimony and Report is not admissible and will not be considered herein. Familiarity with the *Daubert* Order is presumed, but references to it are nonetheless contained in

this Order where necessary to emphasize a point.

## UNDISPUTED FACTS

This lawsuit arises from the death of Plaintiff's decedent, Cynthia Madden, on May 28, 2007, at a railroad crossing at Cleveland Road in Henry County, Colona, Illinois. The crossing was owned and maintained by BNSF Railway Company ("BNSF"). It is equipped with active warning devices[1]: gates, flashing lights, and bells, which warn motorists and pedestrians of oncoming trains.

The movement of trains through the Cleveland Road crossing is sensed and recorded by two separate event recorders, one in the locomotive itself and one at the crossing. At the crossing, the HXP–3 operates the active warning system, and the HCR records the data produced by the HXP–3. The recorder is stored in a small building called a bungalow. The HXP–3 contains a clock; this clock can be set to reflect daylight savings time, but there is no requirement that this option be selected.[2] At the Cleveland Road Crossing, the option had not been selected, so the data recorded by the HCR was one hour behind the actual time. On the night in question, Cynthia Madden was driving her car. As she approached the Cleveland Road railroad crossing, her car stalled in front of a driveway near the crossing. She called her daughter to let her know where she was and her son to ask for help. She was then able to re-start her car. She proceeded into the crossing where her car stalled again, this time on the tracks.[3]

At 9:38:32 p.m.[4], the HCP–3 unit sensed an approaching train. The unit began to calculate the speed and location of the train, in order to determine when the warning signals should activate to provide the requisite 20 seconds of warning time.[5] One second later, at 9:38:33, the warning signals activated. The lights began to flash, the bells began to sound, and the gates began to lower, all while Ms. Madden's vehicle remained stalled on the tracks.

The engineer on the oncoming BNSF train was Debora James. She began sounding the horn (or whistle) on the locomotive as it passed the whistle board. At the time, the train was traveling at 26–28 m.p.h., less than the 30 m.p.h. limit BNSF has set for that area. The horn sounded in the required long, long, short, long pattern, and it sounded for at least 20 seconds before the train entered the crossing.[6]

---

1. Active warning devices such as gates flashers and bells are activated by an approaching train. 23 C.F.R. § 646.204.

2. In Plaintiff's Response (¶ 13) it is incorrectly asserted that the HXP–3 *"requires"* 51 steps to be performed during installation, the 51st of which is selection of daylight savings time. Plaintiff concludes that this 51st option "was not properly selected" so the time being kept was "incorrect." Plaintiff has no evidence to support the proposition that the 51st step is required; in fact, Plaintiff's own (now-barred) expert testified that this step is an "option" and not a mandatory step. (Sottile dep. p. 163–64). Moreover, if one knows that the recorded time must be adjusted by one hour to account for this, conversion of time from standard to daylight is ministerial. This issue was discussed at length in the *Daubert* Order. This is not a genuine dispute of material fact.

3. Plaintiff contends these facts are immaterial. They are recited here for purposes of providing background information only. They are not material to any issue that must be decided in the instant motion.

4. This is the time stamp recorded on the data downloaded from the HCR, adjusted to daylight savings time. All times reported in the subsequent paragraphs are similarly taken from the data download and adjusted for daylight savings time

5. 49 C.F.R. 234.225.

6. Plaintiff denies the facts stated in this paragraph, asserting (SOF ¶ 10) that eyewitness

The conductor on the train, Jan T. Hill, heard the horn begin to sound as the train passed the whistle board and continue to sound until the train entered the intersection, which was more than 20 seconds.

By 9:38:44, the gates were fully lowered; the lights and bells continued to operate. When the train came around the curve, both the engineer and the conductor were able to see a car on the tracks. When the engineer realized it was not moving, she immediately applied the emergency brake. At 9:39:03, 30 seconds after the warning system had activated, the train entered the island[7] and then collided with Ms. Madden's vehicle, which was pushed into her, causing fatal injuries.

One of the eyewitnesses to this horrific incident was Michael Thole. In his affidavit he states that he observed Madden's vehicle pull out in front of him a short distance before the crossing and proceed immediately ahead of him into the railroad crossing. After the car drove onto the tracks, the crossing lights began flashing while the car was still moving forward. It stalled as the gates were coming down. He waited and watched while it appeared that driver was trying to start the car. He got out of his truck and started approach-ing the car, but when by the time he got to the front of his truck he could see the train coming. He observed Madden get out of her car and run; he also saw the train hit her car which then struck her.

Another eyewitness was Curtis Clark. When he pulled up to the railroad crossing there was one vehicle—Thole's—stopped in front of him. The lights were already flashing and the gates were down. He saw the car on the tracks, between the lowered gates, and he heard the train whistle blowing. He observed the car move forward slightly and then stopped. He got out of his vehicle planning to help the driver when he saw the driver get out of the stalled car and look in the direction of the train. He then saw the train hit the car, which hit the driver.

Nine months before this accident, BNSF had conducted an annual safety inspection of the signal warning devices at the Cleveland Road crossing. This test showed that the timing of the gates, bells and flashers were working as intended. Between that inspection and the date of the accident, eight more inspections were conducted, the last one only 19 days before the accident. All showed that the equipment was work-

Curtis Clark's affidavit only states that, when he arrived at the crossing, he heard the whistle blowing, not that he heard the pattern or that it lasted 20 seconds; and that eyewitness Michael Thole's affidavit does not mention the horn at all. The affidavits of both the engineer and the conductor (Motion, Exh. E and F) on the train state that the horn was blown in the required pattern and for more than 20 seconds. The testimonial evidence of the train crew members is supplemented by, not contradicted by, Clark's and Thole's affidavits; the record contains no evidence contradicting the engineer's and conductor's affidavits. To the extent that Plaintiff relies on her experts; testimony and/or their Report, that evidence has been barred (and would not have been sufficient to create a question as to this fact, as neither expert has the requisite personal knowledge.). Plaintiff's assertion that the horn was not blown at all because the locomotive recorder did not record its activation was thoroughly considered and rejected in the Order barring the experts, and need not be repeated here except to state that this argument is without merit. As was pointed out in the *Daubert* Order, experts cannot simply ignore factual testimony. There is no genuine dispute about the facts in this paragraph.

7. BNSF explains that the "island" includes the crossing itself as well as at least 50 feet on either side of the crossing. The 30 seconds that elapsed does not include whatever fractional amount of time it took the train to progress that final 50 feet or so from the edge of the island to the actual intersection with the road, which is of course where the tragic collision occurred.

ing as intended.[8] Subsequent inspections in following months continued to show proper functioning of the warning system.

Ms. Madden's children went to the crossing several days after the accident to place a memorial. While they were there, they heard a train approaching and decided to time the train. Their specific deposition testimony (Exhibits J, K and L to the Motion) about that day is important, because while they all testified that only 13–14 seconds elapsed from the time they saw the train to the time the train entered the intersection, they differed significantly with each other (and sometimes contradicted themselves) in the details of the events surrounding their timing experiment.

Michael Dillard testified that he and his sisters went to the scene 2–3 days after the accident. While they were there, he "heard a whistle, so we all three timed it on my phone, and about 13, 14 seconds before it went through the intersection [sic]. The lights came on about two or three seconds before the train went through." (Exh.L p. 28). He did not know if his sisters actually timed the train separately or if they just watched him. He later stated that from the time he first heard the whistle, it was 13–14 seconds to the time the train went through the intersection. (p.30). He also stated that the gates and lights began operating only two or three seconds before the train went through the intersection. (p.31).

Jennifer Dillard testified that a week or two after the accident (she was not sure of the date) she and Michel went to the scene. She stated that "we just went out there and I timed it with. my—I have a stopwatch—on how close it was, because you can't see around the bend. So we timed it from when you first hear the first horn and the—... gates, when they start going off and going down, that's when we started timing it." (p.41–2). After another question, she clarified that they started timing from "when you first see and hear it" which was "the same time. They honked the horn as they're coming around the corner. That's the first time you could see or hear them. Because we did it to a couple different trains." (p.42). She also stated that what she heard was "one or two short" blasts from the horn. (p.44).

Carrie Dillard testified that the timing was done by Michael Dillard's cell phone (p.43). They could hear a train coming and decided to time it. "He started the timer when we could see that train coming around that bend, and the bars came down like a couple of seconds afterwards. And then that's when you heard the train blowing its horn finally. And then probably about 13, 14 seconds is how long it took before it actually hit the intersection." (p. 43). It took "one to three seconds" for the gates to come down after he started timing. (p.47–8).

## THE PLEADINGS

Plaintiff, as Administrator of Cynthia Madden's Estate, filed this action on May 26, 2009. She alleges that BNSF was negligent (1) "in setting or maintaining the activation of the flashing lights and gates at an interval insufficient to give adequate warning to a motorist to clear the railroad

---

**8.** Plaintiff criticizes the documents that show these tests, because they consist solely of a summary of the test results; no underlying data exists. Regulations require that railroads conduct these tests and maintain the data supporting the tests for one year or until the next test is completed, whichever is longer. 49 C.F.R. 234.273. There is no require- ment that a railroad keep records for any longer period of time when there has been an accident. The criticism is without legal significance. Moreover, it is based on the testimony of the now-barred experts. Other than their testimony, this criticism has no support in the record.

crossing at Cleveland Road for the speed limit[9] of trains on the BNSF tracks in the area" and (2) "the engineer operating the locomotive at the time of the collision was negligent in failing to sound the locomotive whistle until after the Madden vehicle was in sight." (Complaint, Doc.# 1, ¶ 16)[10]

In its answer, Defendant denies these allegations and raised a number of affirmative defenses. As is pertinent to the pending motion, the Third Defense asserts that these claims are preempted by Federal law.

## DISCUSSION

Before beginning a discussion of the specific issues raised by the motion, response and reply, it is necessary to briefly mention Plaintiff's challenge to the constitutionality of summary judgments. The Court is aware that there has been some scholarly discussion in recent years on this subject. No case has been cited for the underlying proposition, however, that use of summary judgment in a civil case impinges on the Seventh Amendment. In light of the extensive application of Rule 56 within this Circuit, this Court declines to make such a finding. Moreover, given the poor development of evidence by Plaintiff, the Court finds that it would be a wholly inefficient use of judicial resources to take on that topic in this case.

### *PREEMPTION*

■ BNSF argues that Plaintiff's claims are preempted because there are two regulations that cover the bases for this litigation: 49 C.F.R. 234.225, which covers the timing required for signal warnings, and 49 C.F.R. 222.21, which covers a locomotive's use of its horn. Plaintiff disagrees with the proposition that these claims are preempted because her claim is that BNSF did not comply with these regulations.

The FRSA contains a section entitled "Preemption." 49 U.S.C. 20106. This section provides: "Laws, regulations, and orders related to railroad safety and laws, regulations, and orders related to railroad security shall be nationally uniform to the extent practicable." 49 U.S.C. 20106(a)(1). Despite this provision, States are permitted to adopt or continue in force laws that are "not incompatible" with federal laws and regulations. 49 U.S.C. 20106(a)(2)(B).

Section 20106 was amended in 2002 to clarify its impact on state law causes of action. A new paragraph (c) was added, which provides:

(1) Nothing in this section shall be construed to preempt an action under State law seeking damages for personal injury, death, or property damage alleging that a party—

(A) has failed to comply with the Federal standard of care established by a regulation or order issued by the Secretary of Transportation ... covering the subject matter as provided in subsection (a) of this section;

\* \* \* \* \*

(C) has failed to comply with a State law, regulation, or order that is not incompatible with subsection (a)(2)

Plaintiff's cause of action is styled as a wrongful death case under Illinois law. Plaintiff claims that Defendant failed to comply with pertinent federal regulations.

---

9. Plaintiff has abandoned any claim that the train's speed was in excess of the mandated limit.

10. This paragraph also asserts that BNSF was negligent "in its maintenance of the railroad crossing and in the operation of the locomotive." The Complaint provides no details. Defendant asserts (Motion p. 3) that this "vague claim ... fails because there is no evidence to support it." Plaintiff has not responded to this assertion in any way. The Court concludes that Plaintiff has abandoned this claim.

The effect of this paragraph is simply that the standards governing the railroad's conduct will be those set forth in federal—not state—regulations. The possibility that a party may ultimately be unsuccessful in showing a violation does not mean that the claim is preempted from the outset. Under the statute as amended, there is no preemption of the cause of action.

### OPERATION OF THE ACTIVE WARNING SYSTEM

Plaintiff's first claim is that the warning time at the intersection was 12–14 seconds, below the 20 seconds required by the pertinent regulation[11]. Defendant asserts that its data shows that there was at least 30 seconds of warning time and that Plaintiff has produced no admissible evidence to contradict that data. See Fed.R.Civ.P. 56(c)(1)(B).

The documentary evidence submitted by BNSF shows that in the 9 months preceding this accident, BNSF had conducted nine safety inspections on the signal warning devices at this crossing. (Exh.B, ¶¶ 12–13; Exh. B(1) pp. 2–11). Each inspection showed that all of the equipment was working as intended. (Exh. B. ¶¶ 12, 14). Another inspection conducted the day after the accident showed the same thing—the signal warning devices were all working properly. (Exh. B ¶ 15; Exh. B(1), p. 12). Several subsequent inspections obtained the same result. (Exh. B, ¶ 16; Exh. B(1) pp. 13–15).

In addition to these tests, the data from the signal event recorder that was record-ed in the signal bungalow shows that there was 30 seconds[12] of warning time—from 20:38:33 when the system activated to 20:39:03 when the train entered the island.

Plaintiff has no documentary evidence with which to counter this evidence. Plaintiff made a strategic decision to base her prosecution of this case on BNSF's documents and her expert witnesses' interpretation of that data. She took no depositions, and she raised no issues as to BNSF's compliance with discovery requests until well after fact discovery closed. Because her expert's criticisms of the data were wholly without merit (as discussed at length in the *Daubert* Order), she is left with only BNSF's interpretation of its own data.

In response to Defendant's evidence, Plaintiff asserts that the only accurate measurement of the warning time was Michael Dillard's timing of a train at the Cleveland Road Crossing several days after the incident. This assertion contains several implicit assumptions. The first assumption is that the documentary evidence provided by BNSF is unreliable, an assumption that is simply not sustainable at this point in the litigation. Plaintiff's challenges to the reliability of BNSF's data are based entirely on the testimony of her experts, both of whom have been barred. Had Plaintiff taken some depositions or conducted other discovery, perhaps there would be support in the record for this assertion. Her strategic decision to rely solely on her experts' interpretation of the

---

**11.** 49 C.F.R. 234.225 provides: "A highway-rail grade crossing warning system shall be maintained to activate in accordance with the design of the warning system, but *in no event shall it provide less than 20 seconds warning time* for the normal operation of through trains before the grade crossing is occupied by rail traffic." *Id.* [emphasis added].

**12.** The affidavit of BNSF's Signal Supervisor James Carlberg (Exh. B) states that there were 31 seconds. His calculation apparently begins the timing at 20:38:32, which is when the system sensed the train and began to calculate when the signals should begin to operate. Because it was one second later when the signals actually began to operate, the court has deducted one second from the total. This one second difference is without significance. All of these times are taken from the printout of the downloaded signal data, which is Exh. B3 to Carlberg's Affidavit.

documents, however, leaves her nothing with which to challenge the reliability of these records and the interpretation given to them by BNSF.

The second assumption contained in Plaintiff's assertion is that the timing experiment is *relevant* evidence. As a general rule, evidence is admissible if it is relevant. Fed.R.Evid. 402. Evidence is relevant if it (1) has a tendency to make a fact more or less probable than it would be without the evidence *and* if it (2) is "of consequence in determining the action." Fed.R.Evid. 401. Even relevant evidence is inadmissible if its probative value is substantially outweighed by a danger of, *inter alia*, confusing the issues or misleading the jury. Fed.R.Evid. 403.

■ The issue in question is whether the active warning system began to activate at least 20 seconds before the BNSF train reached the intersection on May 28, 2007. The timing experiment is some evidence that on a different day with an unknown train traveling at an unknown speed, the active warning system afforded less than 20 seconds of warning. The timing experiment is *not*, however, evidence that tends to make more or less likely the actual amount of warning time given by *this* train on May 28, 2007. The description by Ms. Madden's children of events they observed at some undetermined time days (or possibly weeks) after the events adds nothing of value to the material facts in this case. The unplanned timing of an unknown train on a different day by inexperienced and grieving family members does not tend to make it more probable that the warning system failed to operate properly on May 28, 2007.

Indeed, this evidence is not "of consequence" to an issue in this case. Whether the system operated properly on some other day is not a question the jury must answer. Their attention must be focused on the date of the accident. The evidence fails to meet either prong of the relevance test. Because it is irrelevant, it is inadmissible and cannot be considered in opposition to a motion for summary judgment.

Even if the timing experiment were deemed to be relevant, however, that still leaves the question whether it is sufficient to create a genuine question as to the amount of warning time Ms. Madden was given on May 28, 2007.[13] Although there are some significant differences between the recollections of the siblings as to the timing experiment, one aspect of it on which all three of them agreed was that the timing began when Michael could see the locomotive. Implicitly, they assumed that Ms. Madden had no warning of the train's approach prior to her being able to see it.

■ This assumption—and it is nothing more than an assumption, because Michael and his sisters have no personal knowledge at all about how the active warning system operated on May 28—is belied by all the other evidence in the case. BNSF has produced unrefuted evidence that on May 28, the horn blew in the requisite pattern for 20 seconds before the train reached the intersection, and that the gates began to lower, the lights to flash and the bell to ring 30 seconds before the train entered the intersection.

The eyewitnesses' descriptions of the events also appear to conflict with the assumption that there was no warning at all until Ms. Madden could physically see the train, which was 13–14 seconds before the train reached the intersection. Both of the drivers who were present at the scene

---

**13.** The Court previously held that this evidence was not the type of evidence appropriate for an expert witness to rely on. Nothing about that holding governs the issue now before this Court.

described seeing the gates begin to lower and the lights to flash enough ahead of the train's arrival at the intersection for them to have realized that her car was stalled and that she was not getting out of the car, and for them to have made a decision to get out of their vehicles to help and to have actually exited their vehicles before they saw her get out of her car and run as the train approached. Certainly that took longer than 13–14 seconds.

The children's decision to time a train from the time they could see it, therefore, means that the timing experiment was based on an artificially created situation that did not accurately reflect the realities of the evening in question. Introduction of such evidence would be confusing at best and misleading without question, with only minimal probative value. The evidence is, in other words, not admissible under Fed. R.Evid. 403.

It may been possible—and probably would have been wise—for Plaintiff to have timed trains at this intersection, using proper equipment and more dependable recording techniques and ending up with admissible and probative evidence. This particular method of timing was, however, so undependable and so far removed from the material facts in this case that admitting it would serve no legitimate litigation purpose.

Given the data and affidavits produced by BNSF, the eyewitness affidavits, and Plaintiff's lack of admissible evidence to contradict that evidence, there is only one conclusion. There is no genuine dispute about the material fact that the signal

system worked as it was intended to work on the date of the accident. Defendant's motion for summary judgment as to this claim is therefore GRANTED.

### OPERATION OF THE LOCOMOTIVE HORN

Plaintiff's original claim based on the locomotive horn included the proposition that the locomotive horn was not sounded *at all*. There is undisputed testimony that the horn functioned properly and that it was sounded, and Plaintiff's expert's refusal to incorporate that testimony into his opinion was soundly criticized in the Order barring his testimony. This question is not up for reconsideration in this Order.

Plaintiff's claim is that the horn did not sound for the requisite "at least 15 but no more than 20 seconds [14] before" it entered the intersection. 49 C.F.R. § 222.21(b)(2). To support its argument that the horn was in fact sounded for the proper length of time, BNSF has introduced evidence, namely the affidavits of the engineer and the conductor. The burden therefore shifts to the Plaintiff to produce evidence countering those affidavits. That she has not done. She has attempted in her Response to color those affidavits with wholly unfounded aspersions of bias or even perjury, but as for actual evidence, she has none.

The same is true of the assertion that the horn was not sounded in the requisite "pattern" of two long blasts, one short blast and one long blast. Once again, the crew members' affidavits provide evidence that the horn was sounded in this pattern.

---

**14.** To the extent that plaintiff claims 20 seconds is not long enough, that argument is rejected. The FRSA instructs that the Secretary of Transportation "shall prescribe" regulations for "every area of railroad safety supplementing laws and regulations in effect" on the effective date of that statute in 1970. 49 U.S.C. § 20103(a). See, *CSX Transportation Inc. v. Easterwood,* 507 U.S. 658, 113 S.Ct.

1732, 123 L.Ed.2d 387 (1993) (federal standards preempt state common law claims that seek to impose additional duties upon a railroad); *Waymire v. Norfolk and Western Ry. Co.,* 218 F.3d 773, 776 (7th Cir.2000) (railroad not liable in negligence action for unsafe speed and inadequate warning devices if railroad's conduct was consistent with federal regulations . . .

Plaintiff points [15] to the affidavit of Curtis Clark, a bystander witness, as contrary evidence, because while he states that he heard the horn, he does not state that he heard the "pattern." Clark's affidavit does not contradict the affidavits of the train crew members in any way. That he heard the horn but cannot (or did not) state that he heard the pattern does not mean that the horn was not blown in the pattern. Clark's affidavit is not evidence that supports Plaintiff's theory in the least.

BNSF has produced evidence that the horn was sounded for the required length of time in the required pattern. Plaintiff has produced no evidence to the contrary. BNSF's motion for summary judgment as to this claim is GRANTED.

## PROXIMATE CAUSE

█ BNSF's final argument on summary judgment is that the proximate cause of Ms. Madden's death was that her car stalled on the railroad tracks and she failed to exit to a place of safety, and not any negligence on the part of the railroad. Proximate cause is ordinarily a question of fact for the jury, although where the facts are undisputed and only one reasonable inference can be made, courts can decide the question. *Lockwood v. Bowman Const. Co.*, 101 F.3d 1231, 1235 (7th Cir. 1996).

█ It is indeed undisputed, as Plaintiff points out, that when Ms. Madden first entered the crossing, the active warning system was not activated. That point, however, is not responsive to Defendant's argument. Defendant's point is that, once the gates began to lower, the lights to flash and the bells to ring, all in compliance with regulations, Ms. Madden de-layed in exiting her vehicle, and it was that delay rather than any negligent conduct on BNSF's part that resulted in her death. Plaintiff has conceded that 20 seconds would have been sufficient for Ms. Madden to have exited her vehicle and run (or even walked) to safety (see Response at p. 61–2). In light of the fact that the evidence shows she had more than that amount of time, any legal causation argument fails. There is no admissible evidence that Ms. Madden's tragic death was proximately caused by BNSF's conduct.

## NEW CLAIM

In Plaintiff's response to the motion for summary judgment, she asserts that tests on the warning systems were not done as required by federal requirements. Procedurally, the parties agreed and the Court ordered that amendments to the pleadings would be made before April 15, 2011, so this effort is untimely on its face. Substantively, the assertion that certain tests were not performed is based on nothing but speculation. Neither Plaintiff's lawyer nor her now-barred experts have any personal knowledge or documentary basis for this claim.

### CONCLUSION

For the reasons stated herein, the Motion to Strike [# 69] is DENIED and the Motion for Summary Judgment [# 57] is GRANTED. The Clerk is directed to enter judgment in favor of the Defendant and against the Plaintiff. This case is terminated.

---

**15.** ... other than the thoroughly discredited and now-barred testimony from expert Bodnar that the horn did not blow because the event recorder did not record it. See Order of July 13, 2012, 2012 WL 2874059. Any claim based on an alleged failure to record the horn is preempted by the presence of a regulation that explicitly exempts certain classes of locomotives—including the one in question here—from any obligation to record activation of the horn. See 49 C.F.R. § 229.135.