Catherine STOUFFER
et al., Appellants

v.

UNION PACIFIC RAILROAD
COMPANY, Appellee

No. 11-15-00052-CV

Court of Appeals of Texas,
Eastland.

Opinion filed August 31, 2017

---

J. Woodfin Jone, Charla G. Aldous, Douglas W. Alexander, Austin, Zachary Lynn Boyd, Copperas Cove, Jim Moseley, Stephen F. Malout, Jeremy Charles Martin, Peter Giles Malouf, Jonathan Nockels, Brent R. Walker, Dallas, Jack P. Hill, Dicky Grigg, Austin, Richard O. Leeper, Broadus A. Spivey, Austin, Christian D. Searcy, for Appellant.

Sheryl Sipes Norman, Kent Rutter, Karen Dow, Mainess Gibson, Christina Crozier, Houston, William H. Hoffmann, Jr., Eastland, Sheryl Anne Falk, Houston, John W. Proctor, Fort Worth, for Appellee.

Panel consists of: Wright, C.J., Willson, J., and Bailey, J.

## OPINION

JOHN M. BAILEY, JUSTICE

This appeal arises from a tragic accident where four veterans riding on a flatbed tractor-trailer during the "Show of Support—Hero Parade 2012" in Midland were killed when a Union Pacific train collided with their parade float. Appellants[1] sued Union Pacific for wrongful death and personal injuries, alleging violations of various federal regulations pertaining to railroad crossings. The trial court resolved many of the claims asserted by Appellants by granting partial summary judgment in favor of Union Pacific prior to trial.

The case proceeded to trial on Appellants' remaining claim alleging negligence on the part of the train crew. As the trial progressed, the trial court made an evidentiary ruling concerning expert testimony that Appellants' counsel deemed to be the

---

1. Appellants are Catherine Stouffer, individually and on behalf of the Estate of Gary Lee Stouffer, Jr. and as next friend of Shannon Stouffer and Shane Stouffer; Ada Stouffer; Gary Stouffer, Sr.; Tiffanie Lubbers, individually and on behalf of the Estate of William L. Lubbers and as next friend of Sydnie Lubbers and Zachary Lubbers; and Angela Boivin, individually and as personal representative of the Estate of Lawrence Boivin.

equivalent of a directed verdict for Union Pacific. The trial court subsequently granted summary judgment on this matter, which resulted in a final judgment in favor of Union Pacific on all claims asserted by Appellants. On appeal, Appellants assert that the trial court erred by (1) granting summary judgment against their warning-time claims based on federal preemption grounds, (2) granting summary judgment against their train-crew negligence claim based on federal preemption grounds, and (3) granting summary judgment on their gross negligence claims. We affirm.

## Background Facts

On November 15, 2012, during the "Show of Support—Hero Parade 2012" in Midland, two tractor-trucks pulling flatbed trailers served as floats in the parade. Each tractor-trailer carried twelve veterans and their wives sitting in folding chairs on top of the trailers. The tractor-trailers traveled southbound on South Garfield Street.

Michael Sayre Morris, one of the veterans riding on the first trailer, testified that, as the first tractor-trailer was crossing the Union Pacific railroad tracks located south of West Front Avenue, he heard the railroad crossing bell and saw the Union Pacific train on the tracks. The warning lights at the Garfield crossing activated as the first tractor-trailer was moving off the tracks. At first, Morris thought the train was stopped, but once he was past the tracks, he could tell it was moving fast. Morris saw the gate arm coming down behind the cab of the second tractor-trailer. He then realized the train was going to hit the second tractor-trailer.

When the eastbound Union Pacific train was approximately 2,500 feet away from the Garfield railroad crossing, the engineer aboard the train spotted the first tractor-trailer proceeding through the crossing and said to the conductor, "Look at that idiot. Can you believe this?" But neither the engineer nor the conductor slowed the train. Shortly thereafter, when the train was approximately 1,200 feet away, the second tractor-trailer proceeded through the Garfield railroad crossing. The train crew sounded the train's horn when the train was about 799 feet from the crossing. The train crew applied the emergency brake when the train was about 462 feet from the crossing, but the brakes did not engage until the train was about 46 feet from colliding with the tractor-trailer. The train, traveling at approximately 62 miles per hour, crashed into the last 39 inches of the second tractor-trailer. Four of the veterans riding on the second tractor-trailer were killed in the collision, and several other riders were injured. Appellants are survivors of three of those veterans.

## Analysis

### Warning-Time Claims

■ We review a summary judgment de novo. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). Appellants assert in their first issue that the trial court erred in granting Union Pacific's motion for partial summary judgment on their warning-time claims on the basis of federal preemption. Union Pacific presented its federal preemption contention as a traditional ground for summary judgment. A party moving for traditional summary judgment bears the burden of proving there is no genuine issue of material fact as to at least one essential element of the cause of action being asserted and that it is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Nassar v. Liberty Mut. Fire Ins. Co.*, 508 S.W.3d 254, 257 (Tex. 2017). When reviewing a traditional motion for summary judgment, we review the evidence in the light most favorable to the nonmovant, indulge every reasonable

inference in favor of the nonmovant, and resolve any doubts against the motion. *City of Keller v. Wilson*, 168 S.W.3d 802, 824 (Tex. 2005). A defendant who conclusively negates a single essential element of a cause of action or conclusively establishes an affirmative defense is entitled to summary judgment on that claim. *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 509 (Tex. 2010).

Union Pacific asserted that Appellants' warning-time claim was preempted because federal regulations cover the timing operation of a railroad's warning systems. Appellants contend that their warning-time claim is exempt from preemption because Union Pacific violated federal regulations that establish a federal standard of care. Specifically, Appellants assert that Union Pacific failed to comply with federal regulations pertaining to "designed-warning-time" and "frequency-overlap" claims.[2]

■ The parties do not dispute that state tort law actions challenging the adequacy of railroad crossing warnings are preempted whenever federal regulations address the applicable warning devices. *See Mo. Pac. R.R. Co. v. Limmer*, 299 S.W.3d 78 (Tex. 2009) (addressing federal preemption under federal law and regulations for the selection of the types of warning devices used at a railroad crossing). Congress enacted the Federal Railroad Safety Act of 1970 (FRSA) "to promote safety in all areas of railroad operations and to reduce railroad-related accidents and injuries to persons." *Id.* at 82 (quoting Pub. L. No. 91–458 § 101, 84 Stat. 971 (1970), codified as amended at 49 U.S.C. § 20101). The FRSA calls for "[l]aws, reg-

ulations, and orders related to railroad safety [to] be nationally uniform to the extent practicable," and to that end, the FRSA authorizes the Secretary of Transportation to "prescribe regulations and issue orders for every area of railroad safety." *Id.* (alterations in original) (quoting 49 U.S.C. §§ 20103(a), 20106(a)(1)).

■ As noted by the court in *Limmer*, under Section 20106, federal regulations "covering the subject matter" of a railroad safety requirement preempt state law, including common law tort liability. *Id.* (citing *Norfolk S. Ry. Co. v. Shanklin*, 529 U.S. 344, 357–58, 120 S.Ct. 1467, 146 L.Ed.2d 374 (2000); *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 670–71, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993)). However, when a party alleges that a railway failed to comply with a federal standard of care established by a federal regulation, preemption does not apply. 49 U.S.C. § 20106(b)(1)(A); *see Nunez v. BNSF Ry. Co.*, 730 F.3d 681, 682 (7th Cir. 2013) ("A state may provide a remedy for negligence resulting from violation of federal railroad safety regulations."); *see also Henning v. Union Pac. R.R. Co.*, 530 F.3d 1206, 1214–216 (10th Cir. 2008), *cited in Limmer*, 299 S.W.3d at 80 n.3.

Union Pacific asserts it is entitled to summary judgment on federal preemption grounds because it established as a matter of law that it did not violate the applicable federal regulation concerning warning time. *See Gauthier v. Union Pac. R.R. Co.*, 644 F.Supp.2d 824, 838 (E.D. Tex. 2009) (Federal preemption precludes claim when railroad establishes as a matter of law that it did not violate relevant federal regula-

---

**2.** Appellants premised their frequency-overlap claim on the allegation that a defect in the circuitry caused eastbound trains to trigger shorter warning times than westbound trains. Appellants contend that a frequency overlap for eastbound trains contributed to the partic-

ular eastbound train that was involved in the accident not giving the requisite warning time required by the original design of the warning system. We will collectively refer to these claims as Appellants' warning-time claims.

tion.). The warning time regulation that is relevant to this case is 49 C.F.R. § 234.225, entitled "Activation of warning system." This regulation provides as follows:

A highway-rail grade crossing warning system shall be maintained to activate in accordance with the design of the warning system, but in no event shall it provide less than 20 seconds warning time for the normal operation of through trains before the grade crossing is occupied by rail traffic.

The warning time regulation is relevant to this appeal because it governs the amount of notice required between the flashing of warning lights at a railroad crossing and the arrival of the train at the crossing. Appellants assert that the warning lights at the Garfield Street railroad crossing should have started sooner and that, if they had done so, the gate arms on the crossing would have started their descent sooner, possibly causing the truck driver to stop before driving across the tracks. See 49 C.F.R. § 234.223 ("Each gate arm shall start its downward motion not less than three seconds after flashing lights begin to operate and shall assume the horizontal position at least five seconds before the arrival of any normal train movement through the crossing.").

We first note Union Pacific's contention that its partial summary judgment under Section 234.223 on the timing of the gate arms is dispositive of Appellants' warning-time claim because, Appellants have not challenged it on appeal. Union Pacific bases this contention on the fact that the gate arms do not have to finish their descent until five seconds before the train arrived at the crossing. We disagree with Union Pacific's contention that this ruling is dispositive of Appellants' warning-time claims. Appellants' claims are not based on the contention that the gates were not

fully horizontal in a timely manner but, rather, that the gates should have started moving downward sooner. Under Section 234.223, the downward movement of the gates is triggered by the flashing lights beginning to operate. Accordingly, we direct our analysis toward Section 234.225, the warning-time regulation.

Appellants and Union Pacific disagree on the interpretation of Section 234.225. In summary, Appellants assert that the initial, approved "design of the warning system" at the Garfield Street crossing required a warning time of 30 seconds and that the warning time of 20.4 seconds was not sufficient under "the design of the warning system" component of Section 234.225. Conversely, Union Pacific asserts that the programmed "design of the warning system" only required 25 seconds of warning time and that, as written, Section 234.225 only requires 20 seconds of warning time.

■■■ The resolution of Appellants' first issue requires an interpretation of Section 234.225. The construction of a federal regulation is a question of law. See *Nakimbugwe v. Gonzales*, 475 F.3d 281, 284 (5th Cir. 2007). Accordingly, our review is de novo. See *State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006). In construing a statute, we would first look to the plain meaning of the text, giving undefined terms the ordinary meaning unless a different or more precise definition is apparent from the context. See *Greater Houston P'ship v. Paxton*, 468 S.W.3d 51, 58 (Tex. 2015). We would only resort to rules of statutory construction or extrinsic aids when a statute's words are ambiguous. See *id.* We apply these same rules to our interpretation of Section 234.225, with one notable exception. See *Elgin Nursing & Rehab. Ctr. v. U.S. Dep't of Health & Human Servs.*, 718 F.3d 488, 494–95 (5th Cir. 2013) (applying rules of statutory construction to

the interpretation of regulations). The exception arises from the fact that Section 234.225 is a federal regulation promulgated by the Federal Railroad Administration (FRA), an agency within the Department of Transportation. *See* Grade Crossing Signal System Safety, 61 Fed. Reg. 31802-01 (June 20, 1996). "An agency's interpretation of its own regulation 'becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" *Elgin Nursing & Rehab. Ctr.*, 718 F.3d at 492 (quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945)). In this regard, an agency's opinion letters, handbooks, and other published declarations of its views are authoritative sources of the agency's interpretation of its own regulations. *Id.*

The FRSA granted the Secretary of Transportation authority to prescribe regulations and issue orders relating to railroad safety. 49 U.S.C. § 20103(a). Section 234.225 is contained within Subpart D entitled "Maintenance, Inspection, and Testing" of 49 C.F.R. Part 234 dealing with "Grade Crossing Safety." The FRA promulgated Subpart D between 1994 and 1996 to establish rules "requiring that *railroads* comply with specific maintenance, inspection, and testing requirements for active highway-rail grade crossing warning systems." Grade Crossing Signal System Safety, 61 Fed. Reg. 31802-01, 31802 (June 20, 1996) (emphasis added).

As originally proposed, Section 234.225 simply provided that "[a] highway-rail grade crossing warning system shall activate to provide a minimum of 20 seconds warning time before the grade crossing is occupied by rail traffic." Grade Crossing Signal System Safety, 59 Fed. Reg. 3051-01, 3066 (January 20, 1994). The commentary that accompanied the originally proposed rule indicated that a 20-second minimum was consistent with the Manual on Uniform Traffic Control Devices (MUTCD) issued by the Federal Highway Administration and that it was consistent with "current industry practices." *Id.* at 3059; *see Oliver v. Ralphs Grocery Co.*, 654 F.3d 903, 909 (9th Cir. 2011) ("The federal MUTCD is a regulation promulgated by the Department of Transportation (DOT) that sets 'the national standard for all traffic control devices installed on any street, highway, or bicycle trail open to public travel.'" (quoting 23 C.F.R. § 655.603(a))). MUTCD Section 8C.08 provides that "[f]lashing-light signals shall operate for at least 20 seconds before the arrival of any rail traffic." U.S. DEP'T OF TRANSP., FED. HIGHWAY ADMIN., MANUAL ON UNIFORM TRAFFIC CONTROL DEVICES FOR STREETS AND HIGHWAYS 775 (2009).

The regulation that was finally adopted added additional language. Instead of simply requiring a minimum warning of 20 seconds, the adopted regulation provides as follows:

> A highway-rail grade crossing warning system shall be maintained to activate in accordance with the design of the warning system, but in no event shall it provide less than 20 seconds warning time for the normal operation of through trains before the grade crossing is occupied by rail traffic.

49 C.F.R. § 234.225. The addition of the phrase "the design of the warning system" is significant to this appeal because this phrase is the source of the conflict in the parties' interpretation of Section 234.225. The FRA indicated in its notice that accompanied this change that the additional language was added on the recommendation of "[t]he labor/management group" to reflect "a maintenance, rather than a design requirement." *See* Grade Crossing Signal System Safety, 59 Fed. Reg. 50086-01, 50099 (Sept. 30, 1994). The FRA further indicated that the 20-second minimum

was retained in the regulation to "maintain a minimum activation standard for warning systems." *Id.*

The FRA has issued other publications addressing Section 234.225. The FRA's Office of Railroad Safety has issued a "Signal and Train Control (S&TC) Technical Manual." [3] The overview portion of the Technical Manual addressing 49 C.F.R. Part 234 indicates that it provides "authoritative guidance regarding the correct application of the Federal requirements." It also states that:

> The rules contained in Part 234 are used by inspectors in their inspection and investigation activities, and are the **minimum** standards by which highway-rail grade crossing warning systems are evaluated for compliance. It is pertinent to note that many railroads have adopted their own standards that are more stringent than those set forth in Part 234. However, the FRA and State inspectors can enforce only the **minimum** standards set forth in Title 49 CFR Part 234.

Volume II of the Technical Manual contains a section entitled "Application" addressing Section 234.225. It refers to the "design of the warning system" as the "intended warning time." Specifically, the Compliance Manual provides that "[b]oth the intended warning time and the '20 seconds' provision applies to the design and maintenance of warning systems to provide warning for the normal operation of through trains." The Compliance Manual also contains a section entitled "Classification of Defects" where it indicates that "Defect 234.225.A1" occurs when the crossing warning time is not in accordance with the design of the warning system and "De-

fect 234.225.A2" occurs when the crossing warning system does not provide at least 20 seconds of warning time. The Compliance Manual also contains a "Note," which states: "Defect 234.225.A1 applies to instances where the system warning time differs significantly from the designed warning time."

The FRA also issued Technical Bulletin S-08-02 in 2008 that addressed Section 234.225. The Technical Bulletin provides that crossing warning systems might be designed to activate at different times other than the minimum of 20 seconds. It further provides:

> The designed warning time typically utilizes railroad industry design standards but is, on occasion (as determined by an engineering study that involves the applicable highway agency and railroad representatives), calculated based on criteria such as equipment used, particular crossing intricacies, vehicular traffic patterns, and roadway configurations.

The Technical Manual also provides guidance about the defect classification for when the crossing warning time is not in compliance with the designed warning time. "This defect applies in instances where the system warning time differs significantly from the prescribed warning time...." It defines a "significant difference" as "one that is meaningful or important to the safety and/or credibility of the warning system and a situation in which an expected corrective action must be taken." It further suggests an acceptable range of "plus or minus 5 seconds or more."

■ With this guidance from the FRA pertaining to Section 234.225, we analyze the parties' contentions. Appellants assert that the "design of the warning system" is

---

3. The most recent Technical Manual was issued in April 2012 and consists of two volumes. The cover of the manual identifies it as "Signal and Train Control Regulations, Technical Applications, and Defect Codes." It can be found at https://www.fra.dot.gov/eLib/details/L01187 and https://www.fra.dot.gov/eLib/details/L01188.

the original design of the system. They rely on a 1979 "Railroad Signal Master Agreement" between Union Pacific's predecessor, the State of Texas, and the City of Midland. Exhibit B of the master agreement shows an original designed warning time of 30 seconds for the Garfield Street crossing. Appellants contend that Union Pacific did not have the unilateral authority to reprogram the warning time system to another warning time based on the terms of the master agreement that its predecessor executed with the State and the City of Midland.

Union Pacific acknowledges that the original design plans called for 30 seconds of active warning time; however, it contends that it was permissible for it to reprogram the warning system to provide a designed warning time of 25 seconds, which included five seconds of buffer time. Union Pacific asserts that, since Section 234.225 was adopted after the execution of the master agreement, the regulation supplanted the terms of the master agreement. Union Pacific contends that "the design of the warning system" is the current setting of the warning time system as reflected by the plans located at the crossing. Union Pacific cites 49 C.F.R. § 234.201 in support of this proposition. This regulation provides that "[p]lans required for proper maintenance and testing shall be kept at each highway-rail grade crossing warning system location." Union Pacific further argues that Section 234.225 sets a federal minimum warning time of 20 seconds, which they complied with by providing at least 20 seconds of warning time at the Garfield crossing at the time of the accident.

The warning time setting for the Garfield Street crossing at the time of the accident was entered into the warning system in March of 2012 by Union Pacific. The reprogramming occurred as the result of a field inspection involving representatives of Union Pacific, the City of Midland, and Campbell Technology Corporation. Campbell noted that the design plans for the crossing required 25 seconds of warning time but that the system had been set for a longer warning time. Union Pacific accepted Campbell's recommendation by reprogramming the warning system to provide a warning time of 25 seconds.

We disagree with Appellants' contention that the original design for the warning system as reflected in the 1979 Master Agreement is the controlling "design of the warning system" under Section 234.225. Neither Section 234.225 nor any of the other documents issued by the FRA support this conclusion. The final "notice" documentation pertaining to 49 C.F.R. Part 234 indicated that "maintenance, inspection, and testing and timely response to warning device malfunctions is a *new regulatory field*." Grade Crossing Signal System Safety, 61 Fed. Reg. 31802-01, 31802 (June 20, 1996) (emphasis added). The FRA promulgated Section 234.225 in the mid-1990s, approximately fifteen years after the execution of the Master Agreement. That section is contained within Subpart D, which contains regulations directed at railroads rather than other entities or governmental units. As indicated in one of the summaries issued by the FRA pertaining to Part 234: "FRA is issuing a final rule requiring that *railroads* comply with specific maintenance, inspection, and testing requirements for active highway-rail grade crossing warning systems." Grade Crossing Signal System Safety, 59 Fed. Reg. 50086-01, 50086 (September 30, 1994) (emphasis added).

Union Pacific set the designed warning time for the Garfield Street crossing at 25 seconds, which included 5 seconds of buffer time. This exceeded the minimum warning time of 20 seconds required by Section 234.225. Furthermore, the performance of

20.4 seconds at the time of the accident did not constitute a defect of the design warning time under the FRA's technical bulletin and Technical Manual because it did not constitute a "significant difference" because it fell within the acceptable performance range of plus or minus 5 seconds. Accordingly, we conclude that the warning system at the Garfield Street crossing performed in accordance with the federal standard of care for warning time systems. Thus, Union Pacific was entitled to summary judgment on Appellants' warning-time claim on the basis of federal preemption.

Our conclusion is supported by the few cases that have addressed Section 234.225. Some of these cases have simply determined that a warning that provides at least 20 seconds of warning time satisfies the federal standard of care required by the regulation. *See Nunez v. BNSF Ry. Co.*, 936 F.Supp.2d 969, 977–78 (C.D. Ill. 2012), *aff'd*, 730 F.3d 681 (7th Cir. 2013). We note that this construction is consistent with the statement in the FRA Technical Manual that "FRA and State inspectors can enforce only the **minimum** standards set forth in Title 49 CFR Part 234."

From an analytical perspective, the case that comes the closest to the contentions in this appeal is *Gafen v. Tim-Bar Corp.*, No. 01-7626-CIV, 2002 WL 34731033 (S.D. Fla. Oct. 25, 2002). The plaintiffs in *Gafen* asserted that the warning system did not provide "as much warning time as it was designed to provide." *Gafen*, 2002 WL 34731033, at *4. In reliance upon Section 234.225,[4] the trial court held as follows in *Gafen*:

> It is uncontroverted, however, that the system provided at least 26.7 seconds of warning prior to the Amtrak train's occupation of the grade crossing at Cy-

press Creek Road on May 20, 2000. The warning system, therefore, provided Gafen the 20 seconds of warning required by law. Thus, the Court finds that an action for failure to provide adequate warning is preempted and CSX is entitled to judgment as a matter of law.

*Id.* at *4. Thus, the allegation in *Gafen* was almost identical to Appellants' allegation of a design warning time being in excess of the 20-second minimum. The court rejected the contention that the failure to achieve a design warning time in excess of 20 seconds constituted a violation of Section 234.225.

As noted previously, the MUTCD provides that "flashing-light signals shall operate for at least 20 seconds before the arrival of any rail traffic." U.S. DEP'T OF TRANSP., FED. HIGHWAY ADMIN., MANUAL ON UNIFORM TRAFFIC CONTROL DEVICES FOR STREETS AND HIGHWAYS 775 (2009). The MUTCD provides two exceptions: a shorter signal operating time when all rail traffic operates at less than 20 miles per hour and additional warning time when determined by an engineering study. *Id.* at 775–76. Thus, a signal warning time greater than 20 seconds is the exception rather than the rule. The Federal Highway Administration's Railroad-Highway Grade Crossing Handbook notes that "[c]are should be taken to ensure that warning time is not excessive.... Excessive warning time has been determined to be a contributing factor in some collisions." U.S. DEP'T OF TRANSP., FED. HIGHWAY ADMIN., RAILROAD-HIGHWAY GRADE CROSSING HANDBOOK 125 (2007). Excessive warning time may cause a motorist to cross the track despite the operation of the flashing light signals. *Id.* Accordingly, a longer warning time does not necessarily result in greater safety.

4. The opinion in *Gafen* contains citations to "49 C.F.R. § 234.255." *Gafen*, 2002 WL 34731033, at *3–4. These citations were obvi-

ously intended to be citations to Section 234.225 because that is the regulation quoted by the court. *Id.* at *3.

We overrule Appellants' first issue pertaining to the summary judgment on their warning-time claims. In doing so, we do not reach Union Pacific's cross-points asserting that Appellants cannot satisfy the tort elements of duty and causation with respect to the warning-time claims.

### Gross Negligence Claims

Appellants assert in their third issue that the trial court erred in granting Union Pacific's motion for summary judgment on their gross negligence claims. They premise this claim on their warning-time claims addressed in their first issue, relying upon their frequency-overlap claim to establish the objective and subjective elements of a gross negligence claim. *See Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 248 (Tex. 2008). Accordingly, our resolution of Appellants' first issue is dispositive of their gross negligence claims. We overrule Appellants' third issue.

### Train-Crew Negligence

In their second issue, Appellants contend that the trial court erred by granting summary judgment on their train-crew negligence claim because the claim is exempt from preemption under the "specific, individual hazard" exception recognized in *Easterwood*, 507 U.S. at 675 n.15, 113 S.Ct. 1732. The Supreme Court held in *Easterwood* that federal preemption does not foreclose a lawsuit against a railroad for breaching the duty to slow or stop when confronted with a "specific, individual hazard." *Id.* Appellants contend that the first tractor-trailer constituted a specific, individual hazard that placed a duty upon the Union Pacific train crew to begin slowing the train when they saw the first tractor-trailer. Union Pacific contends that the first tractor-trailer does not fall within the specific, individual hazard exception because the train crew knew that the first tractor-trailer would clear the tracks before the train arrived and because the first tractor-trailer was not involved in the accident.

The U.S. Supreme Court has not defined what constitutes a specific, individual hazard. *Anderson v. Wis. Cent. Transp. Co.*, 327 F.Supp.2d 969, 977 (E.D. Wis. 2004). Courts have generally interpreted the exception narrowly. *Partenfelder v. Rohde*, 356 Wis.2d 492, 850 N.W.2d 896, 899 (2014).[5] A specific, individual hazard is a unique occurrence that could cause an accident to be imminent, rather than a generally dangerous condition. *Hightower v. Kan. City S. Ry. Co.*, 70 P.3d 835, 847 (Okla. 2003). The exception almost always relates to the "avoidance of a specific collision." *Hesling v. CSX Transp., Inc.*, 396 F.3d 632, 640 (5th Cir. 2005) (quoting *Armstrong v. Atchison, Topeka & Santa Fe Ry. Co.*, 844 F.Supp. 1152, 1153 (W.D. Tex. 1994)). The classic examples of a specific, individual hazard are a child standing on the tracks or a motorist standing on the tracks. *See Driesen v. Iowa, Chicago & E. R.R. Corp.*, 777 F.Supp.2d 1143, 1156 (N.D. Iowa 2011). "Imminence and specificity are crucial components of the specific, individual hazard exception to preemption." *Partenfelder*, 850 N.W.2d at 900.

Appellants rely on *Anderson* to support their argument that the first tractor-trailer constituted a specific, individual hazard. In *Anderson*, the court found that a prior vehicle that passed through the railroad crossing could constitute a specific, individual hazard even though it was not involved in the collision between the train and the following vehicle. *Anderson*, 327 F.Supp.2d at 977–79. The prior vehicle unsuccessfully

---

**5.** In *Partenfelder*, the Supreme Court of Wisconsin determined that a parade was not a specific, individual hazard because the parade only created a generally dangerous traffic condition. 850 N.W.2d at 896.

attempted to stop at the crossing after the warning lights started flashing and then accelerated across the tracks prior to the train reaching the crossing. *Id.* The plaintiff argued that, based on the first vehicle's failed attempt to stop, the train crew should have been alerted that there was a problem at the crossing that should have caused the train crew to slow or stop the train. *Id.* at 977. The court found that, if "the movements of the [first] vehicle should have alerted the crew that something was wrong … and created a duty to slow or stop the train, such duty would be a duty to avoid a specific, individual hazard." *Id.* at 978–79.

 This case differs from *Anderson* because the first tractor-trailer did nothing to alert the train crew that there was a problem at the Garfield Street crossing causing them to slow or stop the train. Although the train crew saw the first tractor-trailer proceed through the crossing—causing the engineer to say, "Look at that idiot. Can you believe this?"—the first tractor-trailer successfully drove through the crossing ahead of the train. A collision with the first tractor-trailer did not occur, and nothing in the record shows that, based on the actions of the first tractor-trailer, the train crew knew the second tractor-trailer would proceed through the crossing. Thus, the train crew's observation of the first tractor-trailer did not indicate that a collision with the second tractor-trailer was imminent. Accordingly, the first tractor-trailer did not constitute a specific, individual hazard. Appellants' second issue is overruled.

### This Court's Ruling

We affirm the judgment of the trial court.