**Tracy GRIFFIN, Appellant**

v.

**SHELL OIL COMPANY and CH2M Hill IDC Facilities, Appellees.**

No. 01–09–01089–CV.

Court of Appeals of Texas, Houston (1st Dist.).

June 23, 2011.

Daryl L. Moore, Houston, for Appellant.

Debra D. Hovnatanian, Tracey N. Ellison, Robin K. Taylor, Miles Klaff, Jeromy D. Hughes, Courtney Lyne Scantlin, Houston, for Appellees.

Panel consists of Justices JENNINGS, HIGLEY, and BROWN.

## OPINION

TERRY JENNINGS, Justice.

Appellant, Tracy Griffin, challenges the trial court's rendition of summary judgment in favor of appellees, Shell Oil Company ("Shell") and CH2M Hill IDC Facilities, Inc. ("CH2M"), in Griffin's personal-injury suit against Shell and CH2M. In a single issue, Griffin contends that the trial court erred in granting the summary-judgment motions of Shell and CH2M on his negligent-activity and premises-defect claims.

We reverse and remand.

### Background

In his petition, Griffin alleged that in June 2007, while working as an employee of CFI Mechanical, Inc., a subcontractor, he sustained personal injuries after tripping and falling over a pallet, which had been "randomly" placed on a floor in standing water in a poorly lit storage room in the basement of a building owned by Shell.[1] Employees of CH2M, which was

---

1. Griffin, who had been working at the Shell building since 1991, explained that he worked at the Shell building ninety-five percent of his

the "project manager" at the Shell building, and Constructors and Associates, Inc. ("C & A"),[2] another contracting firm working at the Shell building, had instructed Griffin to go to the storage room to inspect drainage issues. Griffin further alleged that both Shell and CH2M knew about the standing water, dim lighting, and improperly stored and unsecured materials in the storage room and had failed to adequately warn him of the conditions and provide safeguards to prevent his injuries. Griffin asserted that Shell and CH2M were negligent in:

a. Failing to observe job site safety, which caused injuries and damages to [Griffin];

b. Failing to properly train its employees to avoid causing injuries to others on a job site, including [Griffin];

c. Failing to warn [Griffin] of the dangers that [Shell and CH2M] knew or should have known about associated with [Griffin] working in [the basement];

d. Exercising control over the work area and the activity in the area where [Griffin] was working and failing to use ordinary care in ensuring [Griffin's] safety; and

e. Failing to provide a safe workplace for [Griffin].

Shell and CH2M generally denied Griffin's allegations. In its summary-judgment motion, Shell contended that there is no evidence of a premises defect or a concealed defect in the storage room and, alternatively, that Griffin's awareness of the conditions in the storage room negated the existence of any legal duty that it owed to Griffin. In its summary-judgment motion, CH2M contended that Shell controlled the storage room, CH2M had not directed Griffin to the storage room, and it did not breach any legal duty owed to Griffin. It noted that both it and Griffin had been involved in a "storm-mitigation project" to remove standing water from the storage room and Griffin had previously inspected the room as part of the project.

In his response to Shell's motion, Griffin argued that because Shell controlled the storage room and knew that the conditions therein presented an unreasonable risk of harm, it owed him a legal duty to adequately warn him about the conditions and eliminate the risk. In regard to Shell's legal duties, Griffin attached to his response the deposition testimony of Walter Boyd, Shell's site manager, who had admitted that his duties included the management, maintenance, and safety of the storage room. In regard to Shell's breach of its legal duties, Griffin attached to his response his own deposition testimony regarding his previous complaints to both Boyd and Edna Guy, CH2M's project manager, about the unsafe conditions and another slip and fall that had occurred in the storage room. In his testimony, Griffin noted that the storage room, known as the "black hole" and "swamp," was "bad, dark, wet, [and] piled up." As Griffin explained,

Oh, there would be a pallet of stuff moved in there being all blocked off. You'd have to take a different route. I mean, it would change. I don't think it had changed that much from the time I did the initial report from the time I got hurt other than maybe a few pallets had been moved in there; but I mean, over time, yeah, it just became—it got harder and harder to—because everybody is

time on the job and every day of the work week.

2. The trial court severed Griffin's claims against C & A into a separate cause, and C & A is not a party to this appeal.

moving their stuff. Everybody—they was having everybody move their stuff in there too....

. . . .

It was dimly lit, very dimly lit. It was wet. It was piled up full of every kind of piece of scrap junk that's moved off the floors, from metal bars to floor tiles to you name it. It changed weekly. You never walked in there and something didn't get—something wasn't moved in there or something wasn't moved around. You never know what you was going to run into when you went in there, whether you was going to have a clear path or you was going to have to go through the water. I mean, there was constantly Shell or Pioneer or [CH2M].

When describing his fall, Griffin stated,

I had just got in the room. I wasn't even half—the water usually is at the back. I turned the corner to go around to the area that I knew where the drains were or were supposed to be, and I slipped. I slipped into a pallet—I don't know—with my left foot, which I tripped. I fell forward. I grabbed these panels that were stacked up against the column. Next thing I know, I'm trying to wrestle this panel from falling on me without my feet coming out from under, out from underneath me, and it just slams me. It's like I hit the floor; and right before I hit the floor, the panel hits me and just slams me to the floor.

Griffin emphasized that he had warned CFI employees about the conditions in the storage room and the conditions "changed frequently." In support of his argument that Shell had failed to warn him of both obvious and concealed dangers, Griffin cited testimony that the room would "change" because the materials were moved into it by multiple contractors and

vendors and, as a result, "[y]ou never knew what you [were] going to run into."

Moreover, Boyd's testimony reveals that the room had only "egress lighting" and there was not "task lighting" or "enough lighting to actually do work in that room," although he contended that the storage room was not a "work area" and was instead only a "safe" "storage area." Also, Boyd had known that workers would have to survey the storage room for the storm mitigation project, but Shell did not take any actions to correct the conditions in the storage room. Shell could have instructed its contractors to restack the stored materials and ordered CH2M to install more lighting or mats. In fact, after Griffin's accident, Shell had additional lighting and mats installed in the storage room.

Griffin also attached to his response the deposition testimony of Guy and Rollie Krunc, C & A's project manager. Guy testified that Shell knew about the dim lighting, standing water, and stored materials. She also noted that, after Griffin's injury, Shell had paid to install mats and "[ran] some tape to make sure that the people stayed on the mats." Krunc testified that there were "some existing" "hazardous" conditions in the storage room and a photograph of the storage room depicted "haphazard storing of materials."

In his response to CH2M's motion, Griffin argued that because CH2M had acted as Shell's general contractor and controlled both the premises and his work, it owed him the legal duties to warn him of and protect him from the dangerous conditions, and it breached its duties by sending him to the storage room without adequate warnings or protections. In regard to CH2M's control of his work, Griffin attached to his response the deposition testimony of Guy, who admitted that she was the "manager" for the storm mitigation project, CH2M "work[ed] for Shell,"

CH2M provided "project management" services at the Shell building and "over[saw]" all of the infrastructure and constructive changes," Guy was the "only project manager" at the time Griffin was injured, and, "if something was going to be done" at Shell, she was "involved in it." Guy noted that Griffin would do things for her upon request and she and Griffin had worked "closely together." CH2M controlled how Griffin got paid and when and where he worked. And CH2M would oversee the work of C & A and give it directives. However, Guy further testified that CH2M never "actually managed" the Shell building and it was "always totally managed by Shell." Although CH2M oversaw the projects assigned to it, CH2M, at the time of Griffin's injury, did not "control" Griffin because he was "under" C & A and not CH2M "directly." Moreover, CH2M did not manage the storage room, and it had not stored materials in the storage room.

In regard to the relationship between CH2M and C & A, Guy testified that, in some circumstances, CH2M would "go through" C & A to have Griffin "do something," but only if it was a project that C & A was "in control of." Otherwise, Guy could still "go directly" to Griffin. Guy explained that if C & A was involved in a project, she would control or supervise Griffin's work through C & A, but if Griffin was working on a project without C & A's involvement, Guy would control, supervise, and contact Griffin directly.

Griffin also attached to his response his own deposition testimony, in which he noted that he had given to Guy his original report for the storm mitigation project, she had lost or misplaced the report, and she then instructed Krunc to instruct Griffin to prepare another report, which necessitated his trip to the storage room to verify the status of its drains. Griffin reported to Guy "just about every day" on the status of projects that he was doing for her, Guy was Griffin's "person of contact for the mechanical" and she "was over the mechanical," Griffin had been instructed to direct all concerns and problems to Guy as the "project manager," and Griffin believed that Guy was responsible for sending him to the storage room when he was injured. In regard to CH2M's exercise of control over the storage room, Griffin noted that CH2M had instructed another contractor to "move junk down there" and a vendor to "pile" wall partitions in the room. He summarized that CH2M had "instructed" the placement in the storage room of "just about every piece of equipment and junk that was in there" and "CH2M was the one that told people to put it there."

In regard to CH2M's breach of its legal duties, Guy testified that she was aware of the dim lighting, water, and possible movement of materials in the storage room. Also, photographs of the storage room taken at the time of Griffin's injury depict dim lighting, water, and haphazardly stacked materials. Photographs of the room taken after Griffin's injury depict better lighting and rubber mats on the floor. Griffin also attached to his response a "Purchase Agreement," executed between CH2M and Shell, in which CH2M had agreed to "take all necessary precautions to ... protect the premises and all persons and property thereon from damage or injury" and to "leave the premises clean and free of all equipment, waste materials, and rubbish."

In its reply, Shell contended that the evidence established that Griffin was aware of the conditions, which were "common knowledge." In its reply, CH2M contended that it was not a general contractor or property manager, Griffin was not its employee, Griffin reported to his employer CFI, CFI did not work for CH2M, CH2M

did not control the storage room or Griffin's work, and CH2M did not direct Griffin to the storage room on the day of his injury.

After a hearing, the trial court granted the summary-judgment motions of Shell and CH2M and dismissed Griffin's claims with prejudice.

## Standard of Review

To prevail on a summary-judgment motion, a movant has the burden of proving that it is entitled to judgment as a matter of law and there is no genuine issue of material fact. TEX.R. CIV. P. 166a(c); *Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex. 1995). When a defendant moves for summary judgment, it must either (1) disprove at least one essential element of the plaintiff's cause of action or (2) plead and conclusively establish each essential element of its affirmative defense, thereby defeating the plaintiff's cause of action. *Cathey*, 900 S.W.2d at 341. When deciding whether there is a disputed, material fact issue precluding summary judgment, evidence favorable to the non-movant will be taken as true. *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548–49 (Tex.1985). Every reasonable inference must be indulged in favor of the non-movant and any doubts must be resolved in its favor. *Id.* at 549.

To prevail on a no-evidence summary-judgment motion, a movant must allege that there is no evidence of an essential element of the adverse party's cause of action or affirmative defense. TEX.R. CIV. P. 166a(i); *Fort Worth Osteopathic Hosp., Inc. v. Reese*, 148 S.W.3d 94, 99 (Tex.2004). We review a no-evidence summary judgment under the same legal sufficiency standard used to review a directed verdict. *Gen. Mills Rests., Inc. v. Tex. Wings, Inc.*, 12 S.W.3d 827, 832–33 (Tex. App.-Dallas 2000, no pet.). Although the non-movant is not required to marshal its proof, it must present evidence that raises a genuine issue of material fact on each of the challenged elements. TEX.R. CIV. P. 166a(i); *see Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex.2004). A no-evidence summary-judgment motion may not be granted if the non-movant brings forth more than a scintilla of evidence to raise a genuine issue of material fact on the challenged elements. *See Ridgway*, 135 S.W.3d at 600. More than a scintilla of evidence exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex.1997). When reviewing a no-evidence summary-judgment motion, we assume that all evidence favorable to the non-movant is true and indulge every reasonable inference and resolve all doubts in favor of the non-movant. *Spradlin v. State*, 100 S.W.3d 372, 377 (Tex.App.-Houston [1st Dist.] 2002, no pet.).

We note that a summary-judgment motion must stand or fall on the grounds expressly presented in the motion. TEX.R. CIV. P. 166a; *Cincinnati Life Ins. Co. v. Cates*, 927 S.W.2d 623, 625 (Tex. 1996); *McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 341 (Tex.1993). "We are restricted to reviewing the propriety of the granting of the summary judgment on the basis of the grounds actually asserted in the motion for summary judgment." *Cates*, 927 S.W.2d at 626; *Hendrix v. Port Terminal R.R. Ass'n*, 196 S.W.3d 188, 201–02 (Tex.App.-Houston [1st Dist.] 2006, no pet.). It is reversible error to grant a summary-judgment motion on a claim not addressed in the motion. *Chessher v. Sw. Bell Tel. Co.*, 658 S.W.2d 563, 564 (Tex.1983). A trial court errs in granting more relief than requested by disposing of issues not presented to it in the summary-judgment motion. *Perry v.*

*Greanias,* 95 S.W.3d 683, 701 (Tex.App.-Houston [1st Dist.] 2002, pet. denied).

### Negligent–Activity Claims

In a portion of his issue, Griffin first argues that the trial court erred in granting summary judgment in favor of Shell and CH2M on his negligent-activity claims because neither Shell nor CH2M sought summary judgment on these claims.

The Texas Supreme Court has consistently recognized that negligent-activity claims and premises-defect claims involve two independent "theories" of recovery that fall within the scope of negligence. *See Gen. Elec. Co. v. Moritz,* 257 S.W.3d 211, 214–15 (Tex.2008) (distinguishing between "negligent-activity claim" or "theory" and "premises-condition claim" or "theory"); *Clayton W. Williams, Jr., Inc. v. Olivo,* 952 S.W.2d 523, 527 (Tex.1997) (stating that there are "two types of negligence in failing to keep the premises safe: that arising from an activity on the premises, and that arising from a premises defect"); *see also Mayer v. Willowbrook Plaza Ltd. Partnership,* 278 S.W.3d 901, 909 (Tex.App.-Houston [14th Dist.] 2009, no pet.) (stating that "[n]egligent activity and premises defect are independent theories of recovery"). Although "[t]he lines between negligent activity and premises liability are sometimes unclear," the court has continued to recognize the distinction between these two claims, explaining that "negligent activity encompasses a malfeasance theory based on affirmative, contemporaneous conduct by the owner that caused the injury, while premises liability encompasses a nonfeasance theory based on the owner's failure to take measures to make the property safe." *Del Lago Partners, Inc. v. Smith,* 307 S.W.3d 762, 776 (Tex.2010).

▆▆ Recovery on a negligent-activity claim requires that the plaintiff have been injured by or as a contemporaneous result of the "activity itself" rather than by a "condition" created by the activity. *Olivo,* 952 S.W.2d at 527; *Keetch v. Kroger Co.,* 845 S.W.2d 262, 264 (Tex.1992). Although an owner or occupier generally does not owe a duty to ensure that an independent contractor performs its work in a safe manner, an owner or occupier "who retains a right *to control the contractor's work* may be held liable for negligence in exercising that right" under the negligent-activity theory. *Moritz,* 257 S.W.3d at 214 (emphasis added).

### *Shell*

▆▆ Shell argues that the trial court properly granted it summary judgment on Griffin's negligent-activity claim because it asserted in its motion that it did not owe Griffin a legal duty and Griffin did not adequately plead a negligent-activity claim. In his petition, the majority of Griffin's allegations against Shell related to his premises-defect claim and the conditions in the storage room. However, Griffin specifically alleged that Shell was negligent in "exercising control" over the "activity in the area," and, thus, he pleaded a negligent-activity claim against Shell.

Nevertheless, Shell, in its summary-judgment motion, characterized Griffin's suit as "a premises liability case," and it asserted that Griffin had "allege[d] that Shell was negligent in several ways, *all of which relate[d] to the condition[s]* " of the storage room. (Emphasis added.) Shell argued that it was entitled to summary judgment under rule 166a(i) because "there is no evidence that there was a premises defect." Alternatively, Shell argued that that it was entitled to summary judgment under rule 166a(c) because "the undisputed facts establish as a matter of law that Shell owed no duty to Griffin." Shell generally asserted that "there is no

evidence" that "any Shell employee failed to observe job site safety," "Shell failed to properly train any employee," the storage room was "a job site or work area," or Shell failed to provide Griffin a safe workplace.

Shell did alternatively assert that the evidence conclusively negated the existence of any legal duty that it owed to Griffin, but, in its substantive no-duty arguments, Shell only targeted Griffin's premises-defect claim. Specifically, Shell argued that it could not be liable to Griffin because "there was no concealed defect" and Griffin "was aware of all of the conditions" in the storage room. Shell asserted that "the conditions in the [storage] room were common knowledge" and Griffin was familiar with the storage room. Shell contended, thus, that the evidence "disprove[d] as a matter of law that Shell owed Griffin a duty with respect to the conditions." In the conclusion of its motion, Shell again asserted that Griffin, in his fifteen years of work at the Shell building, was "well aware that there was often standing water [in the storage room] . . ., that it was dimly lit, and that there were piles of materials stored there that might cause a trip hazard."

■ Based upon the plain language of Shell's motion, we conclude that Shell sought summary judgment, both under rule 166a(c) and rule 166a(i), only on Griffin's premises-defect claim.[3] Accordingly, we hold that the trial court erred in granting Shell summary judgment on Griffin's negligent-activity claim.[4] *See*

*Hendrix,* 196 S.W.3d at 201–02 (holding that trial court erred in granting summary judgment on plaintiff's negligence cause of action because defendant had failed to address other "specific allegations" of negligence in petition); *Perry,* 95 S.W.3d at 700–01 (stating that although non-movant's factual allegations "were clearly stated" in petition, movant had "failed to offer any arguments or summary judgment evidence" that "precluded either liability or suit based on these allegations").

### CH2M

■ Similar to his allegations against Shell, Griffin pleaded a negligent-activity claim against CH2M, alleging that CH2M was negligent in "exercising control" over the "activity in the area." Similar to Shell, CH2M, in its summary-judgment motion, characterized Griffin's suit as a "premises liability case," asserting that although Griffin had "attempt[ed] to frame [his] claims . . . as a negligence/negligent activity claim," "it is clear that [Griffin's] allegations arise solely from an alleged condition of the premises and sounds in premises liability rather than simple negligence." CH2M then set forth the elements of a premises-defect claim, and it did not address the elements of a negligent-activity claim. In support of its motion, CH2M relied upon evidence that it was not a possessor of the premises, it did not control the premises, and, even if it was a possessor of the premises, it had inspected the premises and "fulfilled any duty to

3. We recognize that Griffin, in his response to Shell's summary-judgment motion, referred to case law related to a negligent-activity claim, and he argued that Shell had retained the right to control his work and exercised that right. However, Griffin's response did not expand the scope of the grounds on which Shell sought summary judgment.

4. A legal duty must be established in order for Griffin to ultimately recover on his negligent-activity claim. *General Elec. Co. v. Moritz,* 257 S.W.3d 211, 214 (Tex.2008). Here, however, Shell, in its summary-judgment motion, confined itself to obtaining summary judgment on Griffin's premises-defect claim. Accordingly, we do not address the viability of Griffin's negligent-activity claim against Shell.

warn [Griffin] of conditions" in the storage room.

Based upon the plain language of CH2M's motion, we conclude that CH2M sought summary judgment only on Griffin's premises-defect claim. Accordingly, we hold that the trial court erred in granting CH2M summary judgment on Griffin's negligent-activity claim. *See Hendrix*, 196 S.W.3d at 201–02; *Perry*, 95 S.W.3d at 700–01.

We sustain the portion of Griffin's issue in which he contends that the trial court erred in granting summary judgment on his negligent-activity claims against Shell and CH2M.

### Premises–Defect Claims

In another portion of his issue, Griffin argues that the trial court erred in granting summary judgment in favor of Shell on his premises-defect claim because Shell had legal duties to "exercise care with respect to matters over which it exercised control," "take reasonable precautions," and warn him about hidden dangers; and Shell did not conclusively establish that it had exercised proper care, the defects were not concealed, Griffin "had full knowledge of the dangers," or Shell "had adequately warned" him.

Griffin further argues that the trial court erred in granting summary judgment in favor of CH2M on his premises-defect claim because CH2M, as a general contractor in control of the premises, owed him a legal duty to use reasonable care to make and keep the premises safe and it breached its legal duty.

There are two types of premises defects for which an independent contractor's employee may seek to hold a premises owner or general contractor liable. *Olivo*, 952 S.W.2d at 527. The first category includes those defects that exist on a premises when a business invitee enters for business purposes or are created through some means unrelated to the activity of the injured employee or his employer. *Id.; Shell Chem. Co. v. Lamb*, 493 S.W.2d 742, 746 (Tex.1973). When dangerous conditions do not arise through the independent contractor's work activity, the owner or general contractor has a duty to inspect the premises and warn about the dangerous conditions of which the owner or general contractor knows or should know. *Moritz*, 257 S.W.3d at 214–15; *Olivo*, 952 S.W.2d at 527. An independent contractor is "under no duty to inspect the premises for *concealed* dangers" because independent contractors may "anticipate" that the owner or general contractor "will discharge [its] duty to inspect the premises and warn of any dangerous condition which is not *open and obvious.*" *Lamb*, 493 S.W.2d at 746 (emphasis added); *see also Moritz*, 257 S.W.3d at 215 (stating that "[g]enerally, a landowner is liable to employees of an independent contractor only for claims arising from a pre-existing defect rather than from the contractor's work, and then only if the pre-existing defect was concealed"). The rationale for this duty is that the owner or general contractor is in a "superior position to know of or discover *hidden* dangerous conditions on his premises."[5] *Lamb*, 493 S.W.2d at 746 (emphasis added).

---

5. When a hidden, dangerous condition exists on a premises at the time an independent contractor enters, or when it "exists through some means other than the [independent contractor's] work activity on the premises," the owner's or general contractor's duty to an independent contractor and its employees "may be discharged by an adequate warning to the [independent contractor] or one supervising his work." *Shell Chem. Co. v. Lamb*, 493 S.W.2d 742, 747 (Tex.1973).

The second category of premises defects includes those defects an independent contractor, or its injured employee, create by its work activity. *Dow Chem. Co. v. Bright*, 89 S.W.3d 602, 606 (Tex. 2002); *Olivo*, 952 S.W.2d at 527. When the independent contractor creates a dangerous condition, the owner or general contractor ordinarily has no duty to warn the independent contractor's employees of the premises defect. *Olivo*, 952 S.W.2d at 527. The rationale for this rule is that an owner or general contractor normally has no duty to ensure that an independent contractor performs its work in a safe manner. *Id.*

In explaining why, under the first category, the duty owed by a premises owner or general contractor to an independent contractor is limited to concealed hazards, the Texas Supreme Court has recently explained that because an independent contractor "owes its own employees a nondelegable duty to provide them a safe place to work, safe equipment to work with, and warn them of potential hazards," a premises owner that "hires an independent contractor generally expects the contractor to take into account any open and obvious premises defects in deciding how the work should be done, what equipment to use in doing it, and whether its workers need any warnings." *Moritz*, 257 S.W.3d at 216–17. The court reasoned that "[p]lacing the duty on an independent contractor to warn its own employees or make safe *open and obvious* defects ensures that the party with the duty is the one with the ability to carry it out." *Id.* (emphasis added).

In *Moritz*, an independent contractor, on a daily basis, loaded trailers with supplies from a General Electric warehouse. *Id.* at 213–14. Moritz, the independent contractor, sustained personal injuries in the course of securing the supplies after a rubber bungee cord that he was using broke and he fell off the side of a loading ramp. *Id.* Based upon the absence of handrails on the loading ramp, Moritz brought a premises-defect claim against GE. *Id.* at 215. The court, noting that the absence of handrails was "obviously a pre-existing condition and obviously not a concealed hazard," concluded that GE had "no duty to warn Moritz that a ramp [that] he had been using for more than a year had no handrails." *Id.* at 216. Although the court acknowledged that GE, as the premises owner, "had a duty to exercise care with respect to matters over which it exercised control," it reasoned that Moritz's premises-defect claim failed because GE "did not control where or how Moritz chose to secure his load." *Id.* at 217. The court noted that "independent contractors are hired for special projects that often entail special expertise, and can be expected to use whatever equipment or precautions are necessary so long as a hazard is not *concealed.*" *Id.* (emphasis added).

### Shell

Citing *Moritz*, Shell argues that the trial court properly granted summary judgment on Griffin's premises-defect claim on the ground that it owed no legal duty to him because Griffin presented no evidence of a "concealed defect" in the storage room and, alternatively, he was "aware of all the conditions of which he complained," negating the existence of a concealed defect as a matter of law.

Griffin did generally complain of defects he knew about, i.e., standing or accumulated water and dim lighting that was inadequate for the work that he was performing. Significantly, however, he also complained of haphazard storage and the stacking of materials or "junk" that changed frequently as a result of multiple vendors and contractors using the room for storage. Boyd agreed that Shell had

retained control over the storage room, and the evidence demonstrated that Shell, after Griffin was injured, took measures to address its defects, including restricting access to the storage room, providing for improved organization of the room, and placing mats in the wet areas of the room. Thus, there is evidence that Shell did, in fact, exercise control over the storage of materials in the storage room as well as the lighting and the manner of storage.

Additionally, Griffin testified that the room would "change" and one "never knew what [one] was going to run into when [one] went" into the storage room. He noted that pallets would be moved, the storage of different items over time would require a person walking through the room to use different "routes," and "they [were] having everybody move their stuff" into the storage room. Griffin explained that the room was "piled up full of every kind of piece of scrap junk ... from metal bars to floor tiles to you name it" and that "it changed weekly." In regard to his fall and injuries, Griffin "slipped into a pallet," tripped and fell forward, and then grabbed "panels that were stacked up against the column." These panels fell on him and "slam[med] him to the floor."

Although Shell did present evidence that Griffin was aware of the general dangers that existed in the storage room, Griffin presented evidence that the specific defects were ever-changing. Thus, unlike the plaintiff in *Moritz*, Griffin was not faced with specific obvious hazards that he already knew about. Resolving all doubts, as we are required to do, in the non-movant's favor, we conclude that, based upon the record before us, there remains a fact issue as to whether the specific conditions that actually caused Griffin's fall and injuries can be described as "concealed" or "hidden." In sum, on this record, we simply cannot say, as a matter of law, that

concealed defects did not cause Griffin's fall and injuries. Accordingly, we hold that the trial court erred in granting summary judgment on Griffin's premises-defect claim against Shell. *See Moritz*, 257 S.W.3d at 218.

To the extent that Shell, in oral argument, asserted that there was no "pre-existing" defect in the storage room, we note that Griffin's premises-defect claim against Shell is based upon his factual allegations and supporting testimony that the conditions and storage of materials in the storage room often changed and, at the time of his injury, he was not aware of the specific defects that caused his fall and injuries. Thus, as noted above, there is at least a fact issue as to whether the materials that caused his fall and injuries were "hidden" or "concealed." Moreover, Griffin presented evidence that Shell controlled the storage room, the storage of materials, and the general conditions therein. His point is that because Shell was aware of the haphazard storage of different materials in the storage room and had control over it, Shell had a legal duty to inspect the storage room and warn him of concealed defects or make it a safe room in which to work.

 If an independent contractor is injured by a concealed defect that is not created by his work activity and the premises is controlled by an owner or occupier, the owner or occupier has a legal duty to, among other things, inspect the premises and warn of dangerous conditions of which the owner or occupier knows or should know and, thus, Texas law permits the contractor to pursue a premises-defect claim against the owner or occupier. *See Olivo*, 952 S.W.2d at 527 (explaining that "first category" of premises-defect claims "are those defects that exist on the premises when the business invitee entered ... *or that are created through some means*

*unrelated to the activity of the injured employee or his employer*") (emphasis added). Thus, we do not interpret the majority opinion in *Moritz* to bar Griffin's premises-defect claim as asserted by Shell. Accordingly, we hold that the trial court erred in granting Shell summary judgment on Griffin's premises-defect claim.

### CH2M

■ CH2M asserts that Griffin "cannot create a genuine issue of fact regarding [its] control [of the storage room] based on testimony that merely suggests [it had] control," it was not a "general contractor," its contract with Shell did not grant "CH2M the right or obligation to control the premises," and it did "not actually control the premises."

■ The legal duty owed by a general contractor to employees of its subcontractor is that duty owed by an occupier of land to a business invitee. *Lamb*, 493 S.W.2d at 746. As explained above, the employee of an independent contractor may seek to hold the general contractor, like the premises owner, liable for premises defects "that exist on the premises when the business invitee entered for business purposes or that are created through some means unrelated to the activity of the injured employee or his employer." *Olivo*, 952 S.W.2d at 527; *Lamb*, 493 S.W.2d at 746. In this situation, in which the dangerous condition does not arise through the independent contractor's work activity, the owner or general contractor has a legal duty to inspect the premises and warn the invitee of those dangerous conditions of which the owner or general contractor knows or should know. *Olivo*, 952 S.W.2d at 527. This legal duty is based upon the "right of control." *See id.* at 528 (stating that "[f]or the general contractor to be liable for negligence, its su-

pervisory control must relate to the condition or activity that caused the injury").

Here, Griffin presented evidence that CH2M had contractually agreed to require subcontractors to, among other things, take all necessary precautions to protect the premises and all persons thereon from damage or injury, and CH2M further agreed to leave the premises "clean and free of all equipment, waste material, and rubbish." Moreover, Griffin testified that CH2M had control over the conditions in the storage room and CH2M had instructed other subcontractors to store and "pile" "junk" in the storage room. Griffin explained that he reported to Guy "just about every day," which would support an inference that CH2M was acting in the capacity of a general contractor and had control over the conditions of the storage room. The testimony provided by Krunc of C & A would also support an inference that CH2M was acting as a general contractor at the time of Griffin's injury.

In addition to Griffin's testimony about CH2M's actual control over the conditions in the storage room, Guy testified that CH2M provided "project management" services at the Shell building and "over[saw] all of the infrastructure and constructive changes." Guy agreed that she was the "only project manager" for a period of time that included the date on which Griffin was injured. She also explained that, "if something was going to be done" at Shell, she was "involved in it." Although CH2M cites conflicting testimony as to its actual role at the time of Griffin's injury, and although Boyd testified that Shell "controlled" the storage room, Griffin has cited evidence that CH2M also had control over the conditions in the storage room.

The Texas Supreme Court has explained that "[w]hen a hidden dangerous condition exists on premises under the

control of a general contractor at the time a subcontractor enters, or exists through some means other than the subcontractor's work activity on the premises, the general contractor's duty to its business invitee/subcontractor and the employees of that subcontractor may be discharged by an adequate warning to the subcontractor or one supervising his work." *Lamb*, 493 S.W.2d at 747. If CH2M was acting as a general contractor and retained or exercised control over the conditions in the storage room that caused Griffin's injury, it necessarily follows that CH2M owed Griffin a legal duty in regard to any hidden, dangerous conditions. *See id.*

Our discussion above about Griffin's premises-defect claim against Shell applies equally to Griffin's premises-defect claim against CH2M. Resolving all doubts, as we are required to do, in favor of Griffin, the non-movant, we conclude that there is some evidence that CH2M had a legal duty to, among other things, warn Griffin of the hidden or concealed conditions in the storage room arising from the storage and stacking of unsecured materials or "junk." Accordingly, we hold that the trial court erred in granting summary judgment in favor of CH2M on Griffin's premises-defect claim.

We sustain the remaining portion of Griffin's issue, in which he argues that the trial court erred in granting summary judgment in favor of Shell and CH2M on his premises-defect claims.

### Conclusion

We reverse the trial court's judgments in favor of Shell and CH2M on Griffin's premises-defect and negligent-activity claims, and we remand for further proceedings consistent with this opinion.