

# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-19-00543-CV

Elsa **PRADO**, Individually and as Representative of the Estate of Rolando Prado, Jr., Deceased, and as Next Friend of A.P., Minor; Elizabeth Prado; Rolando Prado; and Maria Prado; Appellants

v.

**LONESTAR RESOURCES, INC.**, Ezra Alderman Ranches, Inc., and Union Pacific Railroad Company, Appellees

From the 81st Judicial District Court, La Salle County, Texas
Trial Court No. 16-07-00095-CVL
Honorable Susan D. Reed, Judge Presiding[1]

Opinion by:    Luz Elena D. Chapa, Justice

Sitting:    Rebeca C. Martinez, Chief Justice
Luz Elena D. Chapa, Justice
Beth Watkins, Justice

Delivered and Filed: July 28, 2021

AFFIRMED IN PART, REVERSED AND REMANDED IN PART

The Prados (including Elsa Prado, Individually and as Representative of the Estate of Rolando Prado, Jr., Deceased, and as Next Friend of A.P., Minor, as well as Elizabeth Prado, Rolando Prado, and Maria Prado) filed a wrongful death and survival action against appellees Lonestar Resources, Inc., Ezra Alderman Ranches, Inc., and Union Pacific Railroad Company.

---

[1]Sitting by assignment.

The trial court rendered a final summary judgment in appellees' favor. We affirm in part and reverse and remand in part.

## BACKGROUND

Rolando Prado, Jr. worked for an oilfield subcontractor at a wellsite operated by Lonestar Resources. Driving home after his first day of work, Rolando Jr. approached a railroad crossing on a private road owned by Ezra Alderman Ranches (the Ezra Alderman crossing). Before the Ezra Alderman crossing was a stop sign and a crossbuck warning of the railroad crossing. Rolando Jr. approached the Ezra Alderman crossing in his truck just before sunset. A Union Pacific train also approached the crossing. Rolando Jr.'s truck collided with the train. The Prados sued Union Pacific, Lonestar, and Ezra Alderman Ranches. Each defendant filed separate summary judgment motions. Ultimately, the trial court rendered a final summary judgment, ordering that the Prados take nothing on their claims. The Prados timely appealed.

## STANDARD OF REVIEW

We review summary judgments de novo. *Carrera v. Yañez*, 491 S.W.3d 90, 93 (Tex. App.—San Antonio 2016, no pet.). "To prevail on a traditional motion for summary judgment, the movant must show there is no genuine issue as to any material fact and the [movant] is entitled to judgment as a matter of law." *Id.* (alteration in original) (internal quotation marks omitted). "A no-evidence motion for summary judgment must be granted if, after an adequate time for discovery, the moving party asserts that there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial and the nonmovant fails to produce more than a scintilla of summary judgment evidence raising a genuine issue of material fact on those elements." *Id.* at 93–94 (internal quotation marks omitted). "In reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, indulging every reasonable inference and resolving any doubts in the non-movant's favor." *Id.* at 94. "If a trial court grants a

motion for summary judgment that includes both traditional and no evidence grounds, we evaluate the no evidence grounds first." *Id.* "If the nonmovant fails to meet its no evidence burden on any given claim, we need not analyze whether the movant satisfied its burden under the traditional motion." *Id.*

## UNION PACIFIC'S MOTION FOR SUMMARY JUDGMENT

The Prados argue the trial court erred by rendering summary judgment in Union Pacific's favor because the summary judgment evidence shows Union Pacific negligently failed to: (1) issue a slow order[2] for the Ezra Alderman crossing; and (2) use extraordinary means to warn drivers of the extra-hazardous crossing.

### A. Failure to Issue a Slow Order

In the trial court, Union Pacific argued the Federal Railroad Safety Act (FRSA) preempts the Prados' negligence claim for failure to issue a slow order. "The United States Supreme Court limits the preemption doctrine by presuming that Congress did not intend to displace state law." *Great Dane Trailers, Inc. v. Estate of Wells*, 52 S.W.3d 737, 743 (Tex. 2001). "Historically, states have exercised primary authority in matters involving their citizens' public health and safety." *Id.* "Thus, this presumption is nowhere stronger than under circumstances in which the states are exercising that authority." *Id.* Claims "based upon negligence . . . involve the state's power to regulate health and safety matters." *Id.* "Accordingly, the party urging preemption has the difficult burden of overcoming the presumption against preemption." *Id.*

But when that burden is satisfied, "[a] state law that conflicts with federal law is preempted and has no effect." *BIC Pen Corp. v. Carter*, 346 S.W.3d 533, 537 (Tex. 2011). A Texas law may be preempted "expressly, by a federal law specifically preempting state law." *Id.* The FRSA

---

[2] According to the Prados' opening brief, "The engineer testified that Union Pacific issues track warrants for every trip its trains travel, which tell employees certain points in the track to slow down below the speed limit."

expressly preempts certain state laws relating to railroads. *See* 49 U.S.C. § 20106(a)(2)(A). Under the FRSA's preemption provision:

> A State may adopt or continue in force a law . . . related to railroad safety or security until . . . a [federal] regulation or . . . order cover[s] the subject matter of the State requirement. A State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety or security when the law, regulation, or order . . . is necessary to eliminate or reduce an essentially local safety or security hazard.

*Id.* The Prados do not dispute that federal regulations (specifically, federal speed limits for trains) cover the subject matter of train speed on railroads, and generally preempt state law requiring trains to travel more slowly. *See* 49 C.F.R. § 213.9. However, the Prados argue the FRSA does not preempt "claims for breach of the duty to slow or stop a train to avoid a specific, individual hazard."

Congressional intent is the touchstone of any federal preemption analysis. *See Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992). We therefore must construe the FRSA to effectuate this intent. *See id.* "We apply federal rules of statutory construction to federal statutes based on considerations of comity and consistency." *Celadon Trucking Servs., Inc. v. Titan Textile Co., Inc.*, 130 S.W.3d 301, 305 n.4 (Tex. App.—Houston [14th Dist.] 2004, pet. denied). When construing a federal statute, "we must first determine whether the statutory text is plain and unambiguous." *Carcieri v. Salazar*, 555 U.S. 379, 387 (2009). "If it is, we must apply the statute according to its terms." *Id.* We are obligated to follow decisions of the United States Supreme Court on questions of federal law, but the decisions of lower federal courts are not binding on this court. *See Pitts v. Dall. Cty. Bail Bond Bd.*, 23 S.W.3d 407, 418 (Tex. App.—Amarillo 2000, pet. denied).

The FRSA does not further define "essentially local safety or security hazard." Furthermore, the Supreme Court "has not defined what constitutes a specific, individual hazard." *Stouffer v. Union Pac. R.R. Co.*, 530 S.W.3d 782, 792 (Tex. App.—Eastland 2017, pet. denied).

However, under the FRSA, "[e]vidence of pre-emptive purpose is sought in the text and structure of the statute at issue." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993). The FRSA's express pre-emptive purpose is to ensure "railroad security [is] nationally uniform to the extent practicable." 49 U.S.C. § 20106(a). The exception for essentially local safety or security hazards is intended "to enable the states to respond to local situations which are not statewide in character and not capable of being adequately encompassed within uniform national standards." *Nat'l Ass'n of Regulatory Util. Comm'rs v. Coleman*, 542 F.2d 11, 14–15 (3rd Cir. 1976). "Courts have generally interpreted th[is] exception narrowly." *Stouffer*, 530 S.W.3d at 792.

The FRSA generally preempts tort claims based on a failure to slow a train, travelling at or under federal speed limits, based on the general dangers associated with trains and railroad crossings. *See Easterwood*, 507 U.S. at 673–74. "Federal regulations issued by the Secretary pursuant to FRSA and codified at 49 CFR § 213.9(a) (1992) set maximum allowable operating speeds for all freight and passenger trains for each class of track on which they travel." *Id.* at 673. These speed "limits were adopted only after the hazards posed by track conditions were taken into account." *Id.* at 674. Consequently, the FRSA preempts negligence claims alleging a duty to slow a train based on the potential for general hazards at railroad crossings. *See id.* at 673–74. However, the FRSA does not necessarily preempt negligence claims based on a "duty to slow or stop a train to avoid a specific, individual hazard." *Id.* at 674 n.15.[3] The type of hazard involved "turns on the facts of each case." *Id.* at 675.

"A specific, individual hazard is a unique occurrence that could cause an accident to be imminent, rather than a generally dangerous condition." *Stouffer*, 530 S.W.3d at 792. "The classic examples of a specific, individual hazard are a child standing on the tracks or a motorist standing

---

[3] The Court noted it was not reaching a conclusion as to whether the FRSA preempts tort law regarding common law duties to slow a train based on specific individualized hazards. *See id.*

on the tracks." *Id.* "Imminence and specificity are crucial components of the specific, individual hazard exception to preemption." *Id.* (internal quotation marks omitted). Consequently, "[a] condition that can be or is present at many, or most sites cannot be a specific, individual hazard." *Hesling v. CSX Transp., Inc.*, 396 F.3d 632, 640 (5th Cir. 2005).

The Prados argue the "imminence and specificity" elements are not universally accepted, citing *Mo. Pac. R.R. Co. v. Lemon*, 861 S.W.2d 501 (Tex. App.—Houston [14th Dist.] 1993, writ dism'd). In *Lemon*, the court held a row of improperly parked train cars obstructing the train engineer's view of an intersection was a specific, individual hazard. *Id.* at 509–10. The court considered the basis of the duty: "The realization that his view of one side of the crossing was obstructed, coupled with his knowledge of this crossing, triggered a duty for [the engineer] to slow his train as he approached the . . . crossing." *Id.* at 510. The court held the FRSA did not preempt a tort claim based on a breach of this duty, reasoning: "The improper parking of tank cars which obstruct the view of a crossing is not a hazard which the Secretary took into consideration when determining train speed limits under the FRSA." *Id.* Thus, in *Lemon*, although the danger presented by an obstructed view was not necessarily imminent, the engineer was aware of a site-specific condition increasing the risk of hazards beyond the risks generally associated with railroad crossings. *See id.*[4]

---

[4] Other authorities cited by the Prados are distinguishable. *See Stone v. CSX Transp., Inc.*, 37 F. Supp. 2d 789, 795 (S.D.W. Va. 1999) (holding failure to issue slow order was not preempted because federal regulatory duty to slow was triggered by railroad "first receiv[ing] a credible report of a false activation" of warnings at railroad crossing); *In re Speed Limit for Union Pac. R.R. Through City of Shakopee*, 610 N.W.2d 677, 685 (Minn. Ct. App. 2000) (citing confluence of highly unique local factors (exceptionally high vehicle and foot traffic, numerous crossings near each other, and buildings in middle of city, etc.) that make crossing particularly hazardous); *Alcorn v. Union Pac. R.R. Co.*, 50 S.W.3d 226, 242 (Mo. 2001), *overruled on other grounds by Badahman v. Catering St. Louis*, 395 S.W.3d 29 (Mo. 2013) ("The facts support the jury's conclusion that the train crew knew or should have known . . . a collision was imminent."); *Fla. E. Coast Ry. Co. v. Griffin*, 566 So. 2d 1321, 1322 (Fla. Dist. Ct. App. 1990) ("There also was evidence that the railroad and Davis, the train engineer, knew that children regularly crossed the tracks at that spot as a shortcut.").

The Prados contend the summary judgment evidence shows "a number of unique factors coalescing at the Ezra Alderman crossing that rendered [the crossing] a specific, individual hazard outside the scope of preemption." Most notably, there had been four previous vehicle-train collisions at the Ezra Alderman crossing, including a March 2012 fatality and a vehicle-train collision two weeks before Rolando Jr.'s fatal accident that also involved a missed stop sign. But without evidence showing any other reasons why the collisions occurred, a jury could not determine whether the collisions occurred due to the general hazards associated with railroad crossings, or a specific, individual hazard at the Ezra Alderman crossing. The Prados also argue the rate of traffic at the Ezra Alderman crossing was relatively high for a private crossing, but a high rate of traffic at a private crossing is amenable to uniform, national standards, and—without a confluence of other factors that make the crossing's conditions highly unique—does not constitute a specific, individual hazard. *Cf. City of Shakopee*, 610 N.W.2d at 685 (relying on high pedestrian traffic and four other factors, in addition to relatively high vehicular traffic, to make the crossing's conditions a specific, individual hazard). The Prados also argue the curvature of the road leading up to the track made the train more difficult to see, but "cases that involve warning devices, grade, angle, and proximity to highways are all general conditions that are amenable to uniform, national standards and are, therefore, preempted." *Alcorn*, 50 S.W.3d at 242; *see Easterwood*, 507 U.S. at 673 (noting federal speed limits already account for "gage, alignment, curvature, surface uniformity, and the number of crossties per length of track").

Considering the facts of this case, the Prados' claim that Union Pacific negligently failed to issue a slow order is based on the general hazards typically associated with a railroad crossing. The Prados do not cite any evidence showing the train engineer or conductor was aware of a truck or person on the tracks, or of any other unique condition of the Ezra Alderman crossing, that presented a specific safety risk beyond the risks accounted for in setting federal speed limits.

Instead, the Prados cite evidence showing the Union Pacific engineer and conductor were unaware of the prior accidents at the Ezra Alderman crossing. The Union Pacific engineer testified he saw Rolando Jr.'s truck slow down as he approached the crossing, and it appeared the truck was coming to a complete stop, but then Rolando Jr. ran the stop sign. We hold the FRSA preempts the Prados' claim against Union Pacific for negligent failure to issue a slow order for the Ezra Alderman crossing. Thus, the trial court did not err in granting summary judgment as to this claim.

**B. Failure to Use Extraordinary Means to Warn of Extra-Hazardous Conditions**

In the trial court, Union Pacific argued the Prados' failure-to-warn claim was barred because the Ezra Alderman crossing was not extra-hazardous. "Because every railroad crossing is hazardous, statutes set out the minimum standard[s] of safe conduct for both drivers and train operators." *Rankin v. Union Pac. R. Co.*, 319 S.W.3d 58, 63 (Tex. App.—San Antonio 2010, no pet.). The Prados do not argue Union Pacific violated any statute. Instead, they argue Union Pacific failed to comply with the common law duty to use extraordinary means to warn of an extra-hazardous railroad crossing.

"Every railroad crossing is dangerous, but it is only crossings which are found to be extra hazardous that place the higher duty upon the railroad to use extraordinary means to warn travelers along the road." *Id.* at 63–64. "A crossing is extra-hazardous if it is so dangerous that persons using ordinary care cannot pass over it in safety without some warning other than the cross-arm sign." *Id.* at 64. "A crossing may be classified as extra-hazardous if a temporary or permanent condition obstructs a driver's view of an approaching train." *Id.* "The burden is on the plaintiff to show that the railroad crossing is extra-hazardous," and the "plaintiff must establish the crossing was extra-hazardous on the day of the collision." *Id.* "Extraordinary means of warning include signal bells or lights on the crossing, lights on the train cars, or flagging at the crossing." *Id.*

Under *Rankin*, and other authorities cited by the parties, factors that can make a crossing extra-hazardous include an obstructed view of oncoming trains, high frequency of use by the public, and trains traveling at a high rate of speed. *See id.*; *see also Galveston, H. & S.A. Ry. Co. v. Wells*, 50 S.W.2d 247, 251 (Tex. 1932). With their summary judgment response, the Prados produced reports from an engineering and human factors expert, Dr. William D. Berg, and their accident reconstruction expert, Daniel R. Phillips, as well as accident reports from prior accidents at the Ezra Alderman crossing.

Berg opined "the subject grade crossing was unduly, or more than ordinarily hazardous" due to "the presence of the curve on the approach to the subject grade crossing." In his report, Phillips included photographs and diagrams showing the obstruction of a driver's view of approaching trains:



*Figure 2 – Photograph of the scene by others (looking southeast) showing line of sight occlusion(s) on approach.*



*Figure 4 - Portion of scaled diagram showing impact and locations of locomotive and Ford at 4, 5, and 6 seconds prior to impact*

Phillips's report states, "The photographs show that there is a line of sight restriction for eastbound traffic approaching the railroad crossing due to a tree line to the south of the intersection. There is also a fence line with vegetation that may restrict visibility to the lower edge of a train depending upon the sitting height of a driver." Phillips explained, "The derived positions showed that [Rolando Jr.] would have had an obstructed view of the train prior to 6 seconds prior to the impact." Berg explained the curve of the approach made "the motorist's task of detecting and avoiding trains . . . unreasonably difficult due to unique local conditions."

Phillips's report also confirms a driver's view of oncoming trains would be obstructed by two factors. Phillips reported, "The analysis reveals that [Rolando Jr.'s] line of sight to the approaching train was not only limited by the tree line that restricted line of sight due to the scene environment until approximately 6 seconds prior to the crash, but the interior of the Ford itself would have likely blocked [Rolando Jr.'s] vision of the approaching train until approximately 2.5 to 3 seconds prior to impact" (formatting omitted).

In addition to evidence of obstructions of a driver's view of oncoming trains, the Prados' summary judgment evidence shows a high frequency of use by drivers and that Union Pacific's trains travel at a high rate of speed. In his report, Berg described the high frequency of use of the crossing: "Although the subject grade crossing is administratively considered private (no public

funds available for maintenance or improvements), it functions as public grade crossing given that . . . the average daily traffic volume of 50-75 vehicles and about 50-percent trucks is unusually high for a typical private grade crossing." The accident reports also show that in the collision involving Rolando Jr. and in prior collisions, Union Pacific's trains were traveling at speeds between 45 miles and 59 miles per hour. The accident report for Rolando Jr.'s accident shows Union Pacific's train was traveling 58 miles per hour.

Union Pacific argues our decision in *Rankin* is dispositive and that the controlling standard requires considering a driver using ordinary care, who would stop at the stop sign and keep a proper lookout. Union Pacific contends the evidence establishes a driver stopped at the stop sign can see oncoming trains. In *Rankin*, we held that photographs merely showing heavy brush, vegetation, and trees alongside railroad tracks near a railroad crossing "standing alone" was not probative evidence of an extra-hazardous condition. 319 S.W.3d at 66–67. *Rankin* is distinguishable because, here, the record contains significantly more evidence than photographs. The Prados produced not only photographs showing obstructions from vegetation, brush, and trees near the crossing, but expert witnesses who provided detailed factual explanations of how the surroundings obstruct a driver's view of oncoming trains. The Prados' evidence also shows a significant amount of traffic given the crossing's private status and an unusually high rate of accidents at the Ezra Alderman crossing. Furthermore, although Union Pacific argues a reasonably prudent driver would have stopped at the stop sign and kept a proper lookout, the evidence of a high rate of accidents at this crossing raises a fact issue about the adequacy of the signage. And, whether Rolando Jr. exercised reasonable care is ultimately an issue of his proportionate responsibility, which is an issue for the jury to decide. *See* TEX. CIV. PRAC. & REM. CODE § 33.001; *Regent Care Ctr. of San Antonio, L.P. v. Detrick*, 567 S.W.3d 752, 768 (Tex. App.—San Antonio 2018), *aff'd*, 610 S.W.3d 830 (Tex. 2020).

Considering all the evidence together—in a light most favorable to the Prados and drawing all reasonable inferences in their favor—we hold reasonable jurors could disagree as to whether the Ezra Alderman crossing was extra-hazardous. We therefore reverse the trial court's summary judgment as to this claim and remand this claim for further proceedings.

## LONESTAR'S MOTION FOR SUMMARY JUDGMENT

The Prados argue the trial court erred by granting Lonestar summary judgment on their negligent failure-to-warn claim. Lonestar, which operated the wellsite located on a different property, moved for summary judgment on the grounds that Lonestar did not own or control the Ezra Alderman crossing and the hazards presented by oncoming trains at the crossing are open and obvious. The Prados argue they presented evidence showing: (1) Lonestar exercised control over the Ezra Alderman crossing; and (2) the danger was concealed. The Prados argue, alternatively, there is evidence of the "necessary use" exception.

"A general contractor in control of the premises may be liable for two types of negligence in failing to keep the premises safe: that arising from an activity on the premises, and that arising from a premises defect." *Clayton W. Williams, Jr., Inc. v. Olivo*, 952 S.W.2d 523, 527 (Tex. 1997). Because the Prados allege Rolando Jr. was injured by Lonestar's failure to warn of the dangers presented at the Ezra Alderman crossing, their claim is a premises-defect claim. *See id.* It is undisputed Lonestar, which operated the wellsite on a different property, did not own or operate the Ezra Alderman crossing, and the crossing was not located on property Lonestar had owned, leased, or had a contractual right to control. However, the Prados argue Lonestar exercised actual control over the Ezra Alderman crossing.

For actual control, "[t]he relevant inquiry is whether the defendant assumed sufficient control over the part of the premises that presented the alleged danger so that the defendant had the responsibility to remedy it." *County of Cameron v. Brown*, 80 S.W.3d 549, 556 (Tex. 2002).

"[E]vidence of subsequent remedial measures, although inadmissible as to negligence, is admissible to prove control when that issue is controverted." *Cohen v. Landry's Inc.*, 442 S.W.3d 818, 825 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). The Prados cite summary judgment evidence showing that after the accident, Lonestar: (1) held a railroad crossing safety meeting; and (2) at the request of Union Pacific's inspector, hired a third-party flagging company to have a flagger at the crossing. Nothing about Lonestar's railroad safety meeting shows Lonestar assumed any control over the railroad crossing. Although Lonestar hired a flagging company to place a flagger at the crossing after the accident, Lonestar did so at the request of Union Pacific after the accident. According to its corporate representative, Lonestar never thought hiring a flagger for the crossing was an option before Union Pacific's request because "it wasn't our road" and "wasn't our railroad."

The Prados argue this evidence shows Lonestar and Union Pacific exercised joint actual control *before* the accident. The Prados cite *United Scaffolding, Inc. v. Levine* for the proposition that "no general contractor can do the work it was hired to do without the property owner's instructions and access." 537 S.W.3d 463, 478 (Tex. 2017). Ezra Alderman Ranches owned the private road at the Ezra Alderman crossing, and Lonestar was a contractor at a wellsite on a different property. Although Lonestar's subcontractors and their employees were permitted to use the private road on Ezra Alderman Ranches' property, no evidence shows this permission for ingress and egress allowed those subcontractors to erect warning signs or to place flaggers on Ezra Alderman Ranches' private property. There is also no evidence showing Union Pacific or Ezra Alderman Ranches authorized or directed Lonestar to make remedial measures at the railroad crossing before the accident, or that Lonestar unilaterally sought to make remedial measures before or after the accident on its own initiative. *Cf Cohen*, 442 S.W.3d at 824 (noting evidence showing landowner "on its own initiative" sought to control an area outside of its leased premises); *Griffin*

*v. Shell Oil Co.*, 401 S.W.3d 150, 160–61 (Tex. App.—Houston [1st Dist.] 2011, pet. denied) (relying on evidence of post-accident remedial measures in addition to admission by defendant's employee that defendant retained control over room where injury occurred).

Furthermore, the Prados argue the particular premises defect in this case "is the inadequacy of the warning sign at the Ezra Alderman crossing to notify drivers like [Rolando Jr.] of an oncoming train. Although the warning sign may have been visible in broad daylight, it was unilluminated. And because [Rolando Jr.'s] accident occurred around 7:42 p.m. – just four minutes before sunset – the sign would not have been as visible as it might have been during broad daylight." However, the Prados cite no summary judgment evidence showing the danger presented by an oncoming train was concealed at the stop sign or crossing, or that the signage at the crossing was concealed or not visible before sundown, and thus inadequate. *See Olivo*, 952 S.W.2d at 527.[5]

Alternatively, the Prados argue Lonestar owed Rolando Jr. a duty to warn of the open and obvious dangers at the Ezra Alderman crossing, under the "necessary use exception," because driving through the crossing was necessary for Rolando Jr.'s ingress and egress to and from the wellsite where he worked. An employer[6] may owe a duty to warn of open and obvious dangers when "it is necessary that the employee use the dangerous premises and the employer should anticipate that the employee is unable to take measures to avoid the risk." *Austin v. Kroger Tex., L.P.*, 465 S.W.3d 193, 210 (Tex. 2015). This "necessary use" duty is "specific and narrow." *Id.* at

---

[5] Instead, the summary judgment evidence shows, "A review of published sun data from the US Naval Observatory indicates that sunset occurred at 7:46 PM on the day of the crash. The data shows that the sun was just 1.2 degrees above the horizon at an azimuth of 274.1 degrees at 7:38 PM. This would place the sun almost directly behind [Rolando Jr.]." The Prados' expert also testified nothing obstructs the visibility of the stop sign, and the "visibility of the stop sign is not an issue."

[6] We note Lonestar was not Prado's employer. Lonestar operated the wellsite and contracted with Prado's employer 2-M Services, to move oil rigs and rig equipment to the wellsite. For the sake of considering the authorities cited by the Prados, we assume without deciding the rules for employers and employees apply to an employer and an independent contractor's employees.

206–07. Although this specific and narrow duty is an exception to the general rule that there is no duty to warn of open and obvious dangers, the principle nevertheless requires the defendant's control over the premises. *See id.* As we held above, there is no more than a scintilla of evidence showing Lonestar controlled the Ezra Alderman crossing. Because the summary judgment evidence fails to raise a genuine issue of material fact as to whether Lonestar owed Rolando Jr. a duty to warn, the trial court did not err by rendering summary judgment on this claim.

### EZRA ALDERMAN RANCHES' MOTION FOR SUMMARY JUDGMENT

The Prados argue the trial court erred by granting summary judgment on their negligent failure-to-warn claim against Ezra Alderman Ranches.[7] Ezra Alderman Ranches' motion argued no evidence showed it owed Rolando Jr. a duty to warn, was negligent, or that any negligence was the proximate cause of the damages. As a premises liability claim, the Prados' claim against Ezra Alderman Ranches first requires determining whether Rolando Jr. was an invitee or a licensee. *See Hawes v. Link Ministries, Inc.*, No. 07-18-00407-CV, 2020 WL 4723176, at \*2 (Tex. App.—Amarillo Aug. 13, 2020, pet. denied) (mem. op.) ("With respect to premises liability claims, an injured person is classified as either a trespasser, licensee, or invitee.").[8]

**A. Invitee vs. Licensee**

"A licensee is a person who enters on the property of another with the owner or occupier's consent and for the licensee's own convenience." *Id.* "As to a licensee, a property owner or occupier owes a duty not to injure the licensee willfully, wantonly, or through gross negligence, and, in cases in which the owner has actual knowledge of a dangerous condition unknown to the licensee, a property owner owes a licensee the duty to warn or make safe the dangerous condition." *Id.* "An invitee is a person who enters on the property of another, at the owner or occupier's express

---

[7] The Prados argue Rolando Jr. was a business invitee and, alternatively, he was a licensee.
[8] No party argues Rolando Jr. was a trespasser.

or implied invitation, for the mutual benefit of the parties." *Id.* at \*3. "As to an invitee, a property owner or occupier owes the same duties owed to a . . . licensee; and, in addition, the property owner owes a duty to keep its premises reasonably safe." *Id.*

The Prados argue the evidence shows "Ezra Alderman built the road specifically so that oil and gas companies could use it to access Ezra Alderman and neighboring ranches. With specific regard to Prado, Ezra Alderman was aware that Lonestar's contractors and their employees were using Ezra Alderman's road and it facilitated access to the road for their benefit by leaving its gate open." The Prados contend, "Based on this evidence, reasonable jurors could find that use of Ezra Alderman's road by oil and gas contractors and employees such as Prado was a mutual benefit to all ranch owners utilizing the road, including Ezra Alderman." Ezra Alderman Ranches argues "Neither of these facts, even if supported by the record, is evidence of a business relationship" and there is no evidence of a mutual benefit.

We hold the summary judgment evidence shows Rolando Jr. was a licensee. It is undisputed that Rolando Jr. had permission to use Ezra Alderman Ranches' road. However, the Prados presented no evidence showing Ezra Alderman Ranches allowed Rolando Jr. to use their road for a mutual benefit. "We long ago held that the requisite 'mutual benefit' to an invitee and an owner or occupier of property is a shared business or economic interest." *Catholic Diocese of El Paso v. Porter*, 19-0190, 2021 WL 1822943, at \*2 (Tex. May 7, 2021). The evidence on which the Prados rely does not show Rolando Jr. and Ezra Alderman Ranches shared a mutual business or economic interest. We therefore measure the summary judgment evidence by the elements of a premises liability claim asserted by a licensee.

## B. Premises Liability—Licensees

"[I]n order to establish liability, a licensee must prove: (1) a condition of the premises created an unreasonable risk of harm to the licensee, (2) the owner or occupier had actual

knowledge of the condition, (3) the licensee did not have knowledge of the condition, (4) the owner or occupier failed to exercise ordinary care to protect the licensee from danger, and (5) the owner or occupier's failure was a proximate cause of injury to the licensee." *Hawes*, 2020 WL 4723176, at *2.

"In determining whether a condition posed an unreasonable risk of harm, courts have considered various factors, including: (1) whether the condition was clearly marked; (2) whether any injuries had occurred in the past; (3) whether any other invitees had complained about the condition; (4) whether the condition was unusual as compared to other conditions in the same class; and (5) whether the condition met applicable safety standards." *Jefferson Cty. v. Akins*, 487 S.W.3d 216, 226 (Tex. App.—Beaumont 2016, pet. denied). As noted above, the summary judgment evidence shows obstructions of a driver's view of oncoming trains, a high frequency of use by drivers considering the grade of the crossing, a high frequency of accidents at the crossing, and trains travelling through the crossing are operated at a high rate of speed. The evidence of prior accidents permits a reasonable inference that the condition was not clearly marked. *See Rodriguez v. Cemex, Inc.*, 579 S.W.3d 152, 162–63, 167 (Tex. App.—El Paso 2019, no pet.) (considering evidence of prior accidents as evidence showing condition presented an unreasonable risk of harm); *Sanchez v. Stripes LLC*, 523 S.W.3d 810, 813 (Tex. App.—San Antonio 2017, pet. denied) (holding adequacy of warnings requires considering "the totality of the circumstances"). We therefore hold this evidence raises a fact issue as to whether the Ezra Alderman crossing posed an unreasonable risk of harm.

Regarding the second and third elements—the owner or occupier had actual knowledge of the condition and the licensee did not have knowledge of the condition—the evidence also raises a fact issue. The evidence shows the day of the accident was Rolando Jr.'s first day of work. The evidence also shows obstructions of a driver's view of oncoming trains. The evidence therefore

raises a fact issue as to whether Rolando Jr. knew of the dangerous condition or whether the condition was open and obvious. *See Los Compadres Pescadores, L.L.C. v. Valdez*, No. 19-0643, 2021 WL 1148228, at \*11 (Tex. Mar. 26, 2021) (stating that whether danger is open and obvious depends on totality of circumstances). Conversely, Ezra Alderman Ranches' corporate representative testified they were of aware of at least one prior accident involving a fatality, and the evidence shows Ezra Alderman Ranches built and owns the road, and was aware of the conditions at the Ezra Alderman crossing. *See Tex. Dep't of Transp. v. Fontenot*, 151 S.W.3d 753, 763–64 (Tex. App.—Beaumont 2004, pet. denied) (holding that knowledge of prior accidents raised fact issue as to actual knowledge of dangerous condition).

Furthermore, regarding the fourth and fifth elements—the owner or occupier failed to exercise ordinary care to protect the licensee from danger and proximate causation—the evidence of prior accidents raises a fact issue regarding the adequacy of the existing warnings and proximate causation. *See Rodriguez*, 579 S.W.3d at 163 (holding evidence of prior accidents raised fact issue regarding element of causation). Because the summary judgment evidence raises a fact issue as to the challenged elements of the Prados' failure-to-warn claim against Ezra Alderman Ranches, we reverse the trial court's summary judgment as to this claim and remand the claim for further proceedings.

### CONCLUSION

We affirm the trial court's summary judgment in part, as to the "failure to issue a slow order" claim against Union Pacific and as to the Prados' failure-to-warn claim against Lonestar. We reverse the trial court's judgment as to the other claims and remand those claims to the trial court for further proceedings.

Luz Elena D. Chapa, Justice